. Argued June 7, accused suspended July 15, 1971

IN RE COMPLAINT AS TO THE CONDUCT OF
GEORGE C. STAPLES, ACCUSED.

486 P2d 1281

IN BANC

*Francis F. Yunker,* Portland, argued the cause and filed briefs for accused.

*R. Dale Kneeland,* Portland, argued the cause for Oregon State Bar. With him on the brief was Homer L. Allen, Portland.

PER CURIAM.

1. The Oregon State Bar has brought disciplinary proceedings charging the accused attorney with un-

ethical and illegal conduct. The charges all concerned the accused's receipt of money for investment from one client.

The accused became acquainted with his client by representing her in a divorce proceeding. At the conclusion of the divorce she asked him to invest some funds for her and he agreed. The bar charges the investment was made upon the accused's inducement; however, even the client's testimony is to the contrary.

In May 1967 the client withdrew $18,000 from a savings account and the accused put that amount in a savings and loan association account designated, "Geo. C. Staples Trustee for [client's name]." Further deposits in the amount of about $10,000 were made to this account from funds collected by the accused from accounts receivable of his client.

The agreement was that the accused was to pay 8 per cent interest on these funds. No notes or other evidences of obligation were given the client. No security was offered by the accused.

We find, contrary to the charge of the bar, that no express representations were made by the accused that these funds were to be invested in safe investments or in a company that had a successful earning history. However, the client understood, and we believe very understandably so from the circumstances, that the funds were to be invested in safe investments.

The accused had a majority if not the sole interest in a corporation called Harry Welker, Inc. Welker had been formed in the fall of 1965 to perform grubbing and clearing contracts. Commencing in June 1967 the accused made loans from the "trust" account to Welker and secured other funds directly from the

client for loan to Welker. These loans amounted to $14,500. No security was taken and no evidence of obligation was delivered to the client. Eight per cent interest was to be paid.

Commencing in October 1967 the accused borrowed from the "trust" account or secured directly from his client's funds for his personal use a total of $22,140. No security was given and no evidences of obligation were delivered to the client. Eight per cent interest was to be paid.

The client either knew at about the time of the loans or subsequently that the loans were to Welker or the accused personally. She had no objection to the loans. She knew Welker was controlled by the accused.

The bar charges that the accused acted unethically in investing his client's funds in a corporation which he controlled and which was insolvent without obtaining security and without delivering evidence of indebtedness to the client. The accused admits all these facts except that the corporation was insolvent. He produced notes which he says were executed to evidence the loans but which were kept in his possession and which were unknown to his client until later.

No set of books was kept for Welker. Entries on the check stubs were the principal records. Income tax returns were introduced in evidence. According to these Harry Welker, Inc., had a gross income in 1966 of $8,213.02 and a net taxable income of $1,702.04; in 1967 a gross income of $23,000 and a net loss of $12,212.35; and in 1968 a gross income of $5,000 and a net loss of $6,000. According to the accused Harry Welker, Inc., was not insolvent during the eight months during which he put his client's money in the company

because it was engaged in the performance of a $40,000 contract which was expected to generate a substantial profit, but which admittedly caused a $17,000 loss. What records there are also show that at the time of most of the loans of the client's funds to Harry Welker, Inc., the amounts loaned were the only funds from which Welker's current bills could have been paid. The accused also admitted that no bank would have loaned Welker funds without adequate security or guarantees.

An attorney has a fiduciary relationship to his client. *Toomey v. Moore,* 213 Or 422, 430-431, 325 P2d 805 (1958). While it is conceivable that there are circumstances in which it would not be a breach of that fiduciary relationship for an attorney to invest his client's funds in a business which the attorney controls, it is a "risky business" except with the most financially sophisticated clients. Certainly the accused's conduct in this case was a breach of that fiduciary relationship. Unsecured, unevidenced loans were made to a business with no record of successful operation, with unknown prospects in a speculative business, with no capital at the time except that supplied by the loans, with completely inadequate business records, and all this untold to the client.

The bar also charges that the accused was unethical in causing Welker to repay moneys to the accused which he previously advanced to Welker at a time when Welker was insolvent and owed the accused's client. During the period commencing after the accused lent his client's money to Harry Welker, Inc., he repaid himself from the loaned funds the sum of at least $4,264.79. He did make additional advances to Welker during the latter part of its operations; however,

they were in amounts totaling less than he repaid himself. There was no evidence that the accused told his client he was repaying himself from moneys advanced from her funds.

Again, this conduct is a serious breach of the fiduciary relationship between attorney and client. The accused, without so informing his client, was using his client's money to repay debts owed himself.

The bar further charges the accused with unethical conduct in personally borrowing funds from his client without advising his client to obtain independent legal counsel. The personal loans were made with the knowledge and consent of the client. She consented to the unsecured loans, but on the advice of the accused with no independent counsel.

2. Borrowing money from a client is the same as a fiduciary contracting with the beneficiary of his trust and is patently improper unless the beneficiary is advised to seek independent advice upon the advisability of entering into such a contract; otherwise, the lawyer is serving two masters, his personal interest and that of his client.

We find the accused guilty of the charges discussed above.

The trial committee was of the opinion that while the appropriate discipline in the past for the accused's conduct had been disbarment or suspension, it discerned a change in the court's attitude and recommended a public reprimand. The Board of Governors unanimously recommended a two-year suspension. We are in agreement that the latter is the most appropriate discipline.

The client may not suffer any loss because of the conduct of the accused. Upon demand of another

counsel the accused paid $13,000 to his client and at the time of trial had paid approximately another $5,000, leaving a balance of about $4,000, which apparently he has subsequently paid or is paying. The accused testified he told his client he, personally, would repay her the amounts he took from her funds to loan Welker. He so alleged in his answer to the bar's complaint. He submitted as an exhibit at his trial an agreement executed by him and dated the last day of his trial, whereby he guaranteed the payment of the Welker obligation. He has submitted a financial statement which indicates his ability to make such repayment; however, we are impressed that over three years ago it was apparent that Harry Welker, Inc., could not pay these obligations and the client has not yet received repayment of her money from the accused.

The restitution and promise to make complete restitution do militate in the accused's favor; however, the accused did not make an enforceable promise to repay the Welker loans until the bar disciplinary proceeding had commenced. In addition, the discipline to be adjudged should not be dependent upon the lawyer's financial ability to rectify the results of his unethical conduct.

We are adjudging suspension because borrowing a client's money for the personal advantage of the lawyer, without a most complete disclosure of all the facts and without the client receiving independent advice is only a short step away from embezzlement of the client's funds. For this reason the practice is one from which the public is entitled to the utmost protection.

The accused is suspended from the practice of law for a period of two years and thereafter until he

has made application for reinstatement and until he shall affirmatively show that he is in all respects again able and qualified to resume his position as a member of the bar of this state and that his resumption of the practice of law will not be detrimental to the bar or to the public interest.

The Oregon State Bar is also awarded judgment against the accused for its costs and disbursements.