COMMITTEE ON PROFESSIONAL ETH-
ICS AND CONDUCT OF the IOWA
STATE BAR ASSOCIATION, Complain-
ant,

v.

**David L. BRODSKY, Respondent.**

No. 66862.

Supreme Court of Iowa.

April 21, 1982.

Lee H. Gaudineer, Karen E. Shaff and
Hedo M. Zacherle, Des Moines, for com-
plainant.

Roger J. Kuhle of Mumford, Schrage,
Merriman and Zurek, and Alan N. Koufer
of Myers, Knox & Hart, Des Moines, for
respondent.

McGIVERIN, Justice.

This is an appeal by the respondent from
the report and recommendation of our
Grievance Commission in a disciplinary pro-
ceeding conducted pursuant to Supreme
Court rule 118. On November 3, 1980, com-
plainant, the Committee on Professional
Ethics and Conduct of the Iowa State Bar
Association, filed a complaint with the
Commission charging respondent, David L.
Brodsky, an attorney admitted to practice
law in this state, with violations of several
sections of the Iowa Code of Professional
Responsibility for Lawyers. He was
charged with violation of Ethical Considera-
tions 1–5, 9–2, 9–5 and 9–6; Disciplinary
Rules 1–102(A)(1), (4) and (6) and 9–102(A)
and (B)(3); and section 610.24(3) and (4),
The Code.

After hearing, the Commission made its
report, including recommendation, to us
pursuant to rule 118.9. It found that re-
spondent had violated DR 1–102(A)(4) and
recommended his license to practice law be
suspended for a period of one year. Re-
spondent timely appealed from the Commis-
sion's report pursuant to rule 118.11.
Thereafter he filed a motion to open record
and continue submission of the appeal. We
deny this motion. Upon de novo review of
the record and the report of the Commis-
sion, rule 118.11, we suspend respondent's
license indefinitely with no possibility of
reinstatement for three years from the date
of this decision.

We find the following facts from the record. Respondent was admitted to the practice of law in Iowa in 1963. He began to practice in association with a Des Moines law firm. Under the direction of a senior partner in this firm, respondent became involved with the legal matters of B. T. Glidden, Sr. Respondent did legal work for three separate legal entities of Glidden: 1) for Glidden personally; 2) for the LeRoy C. Dunn Trust, of which Glidden was co-trustee; and 3) for B. T.'s, Inc. (B. T.'s), Glidden's personal corporation.

Respondent was a fiduciary for these three Glidden entities. He made investments and provided investment counseling to Mr. Glidden for each entity.

Glidden died in March 1976. At his death, he owned 79 of the 95 outstanding shares of B.T.'s which owned an apartment house and a single-family residential dwelling in Laguna Beach, California. The remaining sixteen shares were owned by his four children. The shares of B.T.'s comprised the majority of the assets of Glidden's estate. His four children were legatees under his will. Respondent was the executor of the estate and his law firm represented him in that capacity.

The Laguna Beach apartment house was sold in December 1976. The proceeds were deposited into the trust account of B.T.'s, maintained at the Central National Bank and Trust Company (CNB) in Des Moines.

In January 1977, respondent traveled to California to confer with Glidden's children concerning possible investment strategies for the assets of the estate. It was determined that the estate would invest in high-risk stocks that had large capital appreciation potential. After his meeting with the legatees, respondent went to San Francisco to vacation for a few days with his wife. On January 11, 1977, respondent contacted Bill Kirke, a broker with Loewi and Company in Des Moines, by telephone and advised

him that B.T.'s had funds available for investment in stocks with high-growth potential. Kirke advised respondent that shares in American Pacific International (API), an oil company traded on over-the-counter markets, would be an ideal investment in the situation. Respondent replied, "All right. Buy 1,000 shares of API for B.T.'s, Inc."

Respondent continued to vacation for a few days and returned to Des Moines on Monday, January 17. Upon arrival at his office in the CNB Building, he found a confirmation slip of the API transaction on his desk. He looked at the slip, drew a check for $6,430 on the CNB trust account of B.T.'s, attached a copy of the confirmation to it, and mailed it to Loewi and Company.

On the afternoon of January 17, respondent reviewed the confirmation slip for a second time. He noticed that the API purchase had been credited to his personal stock account at Loewi and Company, not to the account of B.T.'s.[1] Respondent called Loewi and Company to discuss the error with Kirke, but he was on vacation in Mexico, and could not be reached. Respondent did speak with someone in the office who informed him that the price of API had fallen approximately two dollars per share since January 11 for a paper loss of $2,000.

In the past, Kirke had made errors in transactions for respondent and had corrected them. In this case, however, respondent was concerned with how correction of the error would appear to the Glidden legatees. He felt that since this was the first stock purchase he had made for the estate, it might appear improper for a correction to be made switching API from his account to the B.T.'s account when a loss of $2,000 would thereby result. Respondent decided to leave the API stock in his own stock

1. B.T.'s had no account with Loewi and Company on January 11, 1977. However, Kirke testified that Loewi and Company operated on a "know your customer" basis. This meant that since respondent was well-known to the company his buy order for B.T.'s could be executed, even though B.T.'s had not formally opened a brokerage account. In such cases, the paperwork necessary to open the account would be done in the ten-day period following the transaction.

account and reimburse the CNB trust account of B.T.'s for the $6,430 purchase price. None of the Glidden legatees were consulted about or informed of the situation at this point.

On February 10, respondent was advised by Kirke that it would be advantageous to sell the API stock. A sell order was entered that day on respondent's personal trading account at Loewi and Company. The stock sold for a net of $8,540. A Loewi's check for this amount was issued to respondent and he deposited it in his personal CNB checking account on February 22. On February 25, respondent deposited check number 3953 from his personal CNB account, dated January 18, 1977, for $6,430 into the CNB trust account of B.T.'s. The $2,110 profit from the purchase and sale of the API stock was kept by respondent.[2]

The Committee has the burden of proof to establish by a convincing preponderance of the evidence that respondent has violated the code of professional responsibility as charged. This burden amounts to less than is required in a criminal prosecution, but is greater than is required in a civil suit. *Committee on Professional Ethics v. Randall*, 285 N.W.2d 161, 165 (Iowa 1979), *cert. denied*, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980); *Committee on Professional Ethics v. Rabe*, 284 N.W.2d 234, 235 (Iowa 1979); *Committee on Professional Ethics v. Bitter*, 279 N.W.2d 521, 522 (Iowa 1979).[3] We reject respondent's request that we adopt a more stringent standard of proof. We are not bound by the findings or recommendations of the Grievance Commission but we do give respectful consideration to them. *Rabe*, 284 N.W.2d at 235.

In the present case the Commission made a conclusion of law that respondent had violated DR 1–102(A)(4), which provides: "A lawyer shall not: * * * (4) Engage in conduct involving dishonesty, fraud, deceit,

---

2. Respondent's version of the events after the January 17 discussion with Loewi and Company diverges markedly from the facts we have found and set forth above. We find his version less than credible in several respects. He contends that after he made the decision to keep API in his account he wrote check number 3953 on his personal CNB account, dated January 18, for $6,430 payable to B.T.'s and gave it to his secretary to deposit.

Respondent testified that he talked to CNB vice-president John T. Waters to secure a $6,500 loan to cover check 3953. He says that Waters approved the loan by saying "fine". However, no deposit of funds was made into respondent's account and Waters had no recollection of respondent contacting him in January or February 1977 in regard to a loan for investment purposes.

Although neither party argued that check 3953 was presented to CNB before February 25, 1977, there was an endorsement from the bank on the back of the check dated January 17, 1977. Both parties claim this was due to an unexplained error, but that endorsement could support an inference that the endorsement may have been caused by respondent's presentment of the check on January 17. He may have presented it, and received notice that it would not be honored due to insufficient funds in his account.

On the other hand, at the hearing before the Commission it was shown that check number 3952 was dated February 23, 1977, and check number 3954 was dated February 28, 1977. This fact presented a strong inference that respondent wrote check number 3953 on the date it was deposited, February 25, and back-dated it to January 18, 1977.

Respondent attempted to refute any such inference of back-dating by testifying that he had taken the forty-two checks preceding number 3953 with him on his trip to California. He said he left them in his suitcase because of his late arrival on January 17, 1977, and did not bring them back to the office on that day. Respondent says 3953 was the next check in his book on January 17.

Respondent testified that his secretary, whose name he could not remember, misplaced check 3953 in her desk. He claimed he discovered it on February 25, 1977, and immediately deposited it himself into the CNB trust account of B.T.'s. There was evidence presented that respondent's office manager, rather than his secretary, would have been in charge of such deposits.

There also was evidence that respondent later offered the $2,110 profit to Thomas Glidden, Jr., one of the Glidden legatees and president of B.T.'s, but that he declined to take it. None of the other legatees were contacted. Respondent's explanation for keeping the profit was that since he took the risk, he was entitled to the profit.

3. For a discussion of this standard of proof, see *Committee on Professional Ethics v. Kraschel*, 260 Iowa 187, 193–94, 148 N.W.2d 621, 625 (1967).

or misrepresentation." Its conclusion was based on the finding that respondent made a decision to assume B.T.'s property as his own on January 17, 1977: "It is the view of the Commission that the Respondent's conduct ... in which he arbitrarily, unilaterally and without the consent of his client decided to take over the client's property, constitutes a violation of DR 1–102(A)(4), being conduct involving dishonesty, fraud, deceit or misrepresentation regardless of what transpired thereafter."

■ We find that respondent's conduct was dishonest. Brodsky's use of B.T.'s funds, without the knowledge or consent of the Glidden legatees, has netted him a profit of $2,110. The whole series of transactions was typified by a lack of fairness and straight-forwardness. Respondent has shown a lack of integrity in principle. *See Webster's Third International Dictionary* at 650 (1976). DR 1–102(A)(4) has been violated. Respondent should have promptly caused the stock to be transferred to B.T.'s account upon his discovery of the error by the investment firm, regardless of any possible later loss of confidence in him by the Glidden legatees as to the caliber of his investment skills.

We are also troubled by respondent's explanation to the Grievance Commission. As the Committee on Professional Ethics and Conduct produced a series of records indicating respondent's ethical violation, he replied with a web of responses that was replete with inconsistencies and falsehoods. We find that respondent was untruthful in his defense before the Grievance Commission. This untruthfulness calls into question respondent's basic character, "[t]he first requisite of an attorney. . . ." *Committee on Professional Ethics and Conduct v. Crary*, 245 N.W.2d 298, 307 (Iowa 1976).

■ The discipline mandated for a breach of professional responsibility is determined by a consideration of "the respondent's fitness to continue in the practice of law, deterrence of others from similar conduct, and assurance to the public that the courts will maintain the ethics of the profession." *Rabe*, 284 N.W.2d at 235; *Com-*

*mittee on Professional Ethics v. Roberts*, 246 N.W.2d 259, 262 (Iowa 1976). "The form and extent of a disciplinary sanction, however, must be tailored to the specific facts and circumstances of each individual case." *Committee on Professional Ethics and Conduct v. Rogers*, 313 N.W.2d 535, 537 (Iowa 1981).

Other evidence showed that respondent has been an able, competent and ethical practitioner for over eighteen years; that the incident in question was an isolated one; and that respondent wanted to avoid losing face with the Glidden legatees concerning what initially appeared to be a poor investment. No doubt this tempered the recommendation of the Commission. However, the fact remains respondent in effect used B.T.'s funds for approximately five weeks and retained the profit therefrom of $2,110 for himself. In addition, his falsehoods before the Grievance Commission were "diametrically opposed to the fundamental dut[y] of attorneys to bring truth rather than untruth to light. . . ." *Crary*, 245 N.W.2d at 307.

We suspend David L. Brodsky's license to practice law in the courts of this state indefinitely. During the period of suspension he shall refrain from the practice of law as that term is defined in Court Rule 118.12. Because we find a one-year suspension is inadequate discipline in this case, his license shall not be reinstated for at least three years. An application for reinstatement shall be governed by Court Rule 118.13.

LICENSE SUSPENDED.

All Justices concur except ALLBEE, J., who takes no part.