319 S.E.2d 381

The **COMMITTEE ON LEGAL ETHICS OF the WEST VIRGINIA STATE BAR**

v.

Ray Michael **TATTERSON**, a member of the West Virginia State Bar.

No. 16238.

Supreme Court of Appeals of West Virginia.

July 12, 1984.

Robert H. Davis, Jr., W.Va. State Bar, Charleston, for appellant.

Ross Maruka, Fairmont, for appellee.

MILLER, Justice:

■ This is a disciplinary proceeding instituted by the Committee on Legal Ethics of the West Virginia State Bar against Ray Michael Tatterson, a member of the Bar. The Committee has concluded that Mr. Tatterson commingled client funds, that he failed to deliver to his clients their proper share of settlement proceeds, that he failed to account properly for the proceeds, that he misrepresented facts to his clients, and that he converted his clients' funds to his own use. It has recommended that Mr. Tatterson's license to practice law be suspended for two years. We conclude that the Committee's charges, while containing some redundancy, are supported by the record and that the Committee has met the standard of proof contained in Syllabus Point 1 of *Committee on Legal Ethics v. Pence*, W.Va., 216 S.E.2d 236 (1975):

> "In a court proceeding initiated by the Committee on Legal Ethics of the West Virginia State Bar to annul [or suspend] the license of an attorney to practice law, the burden is on the Committee to prove, by full, preponderating and clear evidence, the charges contained in the Committee's complaint."

*See also Committee on Legal Ethics v. Daniel*, 160 W.Va. 388, 235 S.E.2d 369 (1977); *Committee on Legal Ethics v. Pietranton*, 143 W.Va. 11, 99 S.E.2d 15 (1957).

■ In November 1980, Mr. and Mrs. Wickham retained Mr. Tatterson to represent them on an insurance claim against State Farm Fire and Casualty Company. The claim grew out of a fire which had destroyed their mobile home and personal property.

Mr. Tatterson entered into negotiations with James R. Watson, attorney for State Farm, and Mr. Watson, on behalf of State Farm, eventually offered to pay approximately $28,000 for the loss. Of this sum, approximately $10,500 was to be used to release a deed of trust against the premises owned by the Wickhams. The deed of trust had been executed by the Wickhams to secure the payment of a loan from the Blueville Bank. The Bank had been named a co-insured on the State Farm policy, and State Farm had, prior to the conclusion of the negotiations with Mr. Tatterson, paid the Bank. In return, the Bank had assigned the note and deed of trust to State Farm. The remaining $17,500 provided for in the settlement proposal was to be paid to the Wickhams. This settlement proposal was outlined in a letter dated February 26, 1981, from Mr. Watson to Mr. Tatterson. Mr. Tatterson accepted this proposal on behalf of the Wickhams in a letter to Mr. Watson dated March 9, 1981.

Pursuant to the agreement, Mr. Watson sent Mr. Tatterson a check for $17,500 made payable to "Grant D. Wickham, Mary Jane Wickham and R. Michael Tatterson, their attorney." The check was accompanied by a letter dated March 16, 1981. The letter made it clear that the Bank had been paid for the debt secured by the deed of trust. The original deed of trust together with the Wickhams' note was enclosed. Also enclosed was the original of the Bank's assignment of its deed of trust to State Farm. Mr. Watson explained in his letter that this assignment should be recorded along with the release of the assigned deed of trust which he was procuring from State Farm, and which he would forward to Mr. Tatterson as soon as it was received.

Mr. Tatterson received Mr. Watson's letter and check on March 17, 1981, and he contacted the Wickhams immediately. Later the same day, the Wickhams appeared in Mr. Tatterson's office, and endorsed the State Farm check. Mr. Tatterson then proceeded to give them a check for $8,076.50,

which, he informed them, was their share of the proceeds. On the following morning, he deposited the $17,500 State Farm check in his office account, rather than in his clients' trust account.

According to the Wickhams, they were unhappy with the amount they had received. It was the Wickhams' position that despite repeated attempts to have Mr. Tatterson state his fee, he put them off by statements that he would be fair. Mrs. Wickham testified that she questioned Mr. Tatterson at the closing on March 17 as to the amount he was retaining. She said that he explained that the retention was necessary in order to reimburse State Farm for the amount it had paid the Blueville Bank for the release of the deed of trust. She testified that she called Mr. Tatterson later that evening to complain about the amount he had retained.

Some two weeks later she contacted the local agent of State Farm to see if reimbursement of its payment to the Blueville Bank had to be made from the settlement check. She was informed that reimbursement was not required and was advised to call Mr. Watson, who also confirmed this fact. On April 2, 1981, Mrs. Wickham called Mr. Tatterson about the information obtained from State Farm. On April 3, 1981, Mr. Watson wrote to Mr. Tatterson stating that reimbursement was not required and referred to his February 26, 1981 letter outlining the settlement proposal.

Mr. Tatterson's testimony relative to the fee arrangement was that after he initially reviewed the matter he informed the Wickhams that his fee would be one-third. He acknowledged that no written fee arrangement was made. He stated that at the time the disbursement was made to the Wickhams on March 17, there was no specific discussion of the fee. He did not recall that the Wickhams were upset at the amount they received at the time, but he did recall the phone call later in the evening from Mrs. Wickham. His recollection was that she only complained about his incompetency in failing to secure the release of the deed of trust.

He also remembered her call around April 2, 1981, regarding the State Farm deed of trust payment. His version of the conversation was that she told him that he had not paid State Farm and accused him of being incompetent. At this point, Mr. Tatterson stated that "he hit the panic button" and thought it was his duty to pay State Farm for the release of the deed of trust.

He then sent a letter to Mr. Watson dated April 3, 1981, enclosing his check for $9,424, the amount remaining from the $17,500 settlement. In the letter, he stated that the check was to pay off the deed of trust indebtedness held by State Farm. On the same day, he wrote the Wickhams stating that he had paid State Farm for the deed of trust. The check was later returned to Mr. Tatterson by Mr. Watson.

After receipt of Mr. Watson's letter of April 3, 1981, which referred to Watson's earlier letters stating that reimbursement was not required, Mr. Tatterson on April 6, 1981, wrote the Wickhams. In this letter he stated: "I feel now that charity is no longer in order and I have computed a fee upon a 25% settlement basis (33⅓ if we had gone to trial)." He then gave an explanation as to how he calculated his fee.[1] He enclosed a check for $2,549 to reduce his fee to 25 percent.

---

1. Mr. Tatterson's letter of April 6, 1981, stated:
   "I am pleased to tell you that I received notification from James Watson today that State Farm is paying the Mortgage without recourse. In other words, that means we have the complete disbursement of the funds.
   "I feel now that charity is no longer in order and I have computed a fee upon a 25% settlement basis (33⅓ if we had gone to trial).

| Receipts/ Payment of Mortgage | $10,100.00 |
| Cash | $17,500.00 |
| Total | $27,600.00 |

| | |
|---|---|
| The fee is 25% of $27,600.00 | $ 6,875.00 |
| Your total proceeds including Mortgage payment | $20,725.00 |
| Less Mortgage payment | $10,100.00 |
| | $10,625.00 |
| You have received | $ 8,076.00 |
| Balance enclosed | $ 2,549.00 |

"I have already sent my check to State Farm which I will stop payment on. Please hold this check until Friday in the event the bank holds anything up."

Mr. Tatterson stated that he had two or three subsequent telephone conversations with Mrs. Wickham about further fee reduction. Later he found a telephone message on his desk that Mrs. Wickham was going to the State Bar unless he gave her $5,000. On May 5, 1981, he wrote the Wickhams advising them that he believed the 25 percent fee was reasonable and that he considered the matter closed.

Subsequently, on or around June 4, 1981, Mrs. Wickham contacted the State Bar, which, in turn, contacted Mr. Tatterson. In an effort to resolve the matter, Mr. Tatterson then had a lengthy discussion at Mrs. Wickham's mother's house with the Wickhams and agreed to reduce his fee to $5,000. The Wickhams agreed that the reduction would be acceptable to them. He subsequently gave the Wickhams $1,875, which reduced his fee to $5,000.

We believe the Committee's finding that no fee arrangement was ever established is correct. Admittedly, there was a dispute in the testimony, but the documentary evidence clearly points to this conclusion. Mr. Tatterson's letter of April 6, 1981, *see* note 1, *supra*, clearly suggests no prior contingent fee arrangement with the phrase "charity is no longer in order." This, coupled with the fact that the letter asserts a 25 percent contingent fee, refutes his testimony that the fee was originally 33⅓ percent.

While the Code of Professional Responsibility does not require that attorney-fee contracts be in writing, it does point out that a "clear agreement" should be reached as to the basis of the fee. Furthermore, it indicates that written contracts are desirable, particularly in the contingent-fee context:

"As soon as feasible after a lawyer has been employed, it is desirable that he reach a clear agreement with his client as to the basis of the fee charges to be made. Such a course will not only prevent later misunderstanding but will also work for good relations between the lawyer and the client. It is usually beneficial to reduce to writing the understanding of the parties regarding the fee, particularly when it is contingent. A lawyer should be mindful that many persons who desire to employ him may have had little or no experience with fee charges of lawyers, and for this reason he should explain fully to such persons the reasons for the particular fee arrangement he proposes." EC 2–19, Code of Professional Responsibility.

There is the general rule which places the burden on an attorney to establish his fee agreement where there is a dispute as to the fee. *E.g., Trafton v. Youngblood,* 69 Cal.2d 17, 442 P.2d 648, 69 Cal.Rptr. 568 (1968); *Greenbaum & Browne, Ltd. v. Braun,* 43 Ill.Dec. 303, 88 Ill.App.3d 210, 410 N.E.2d 303 (1980); *Paxton v. La Barre,* 253 So.2d 248 (Miss.1971); *Rock v. Ballou,* 22 N.C.App. 51, 205 S.E.2d 540 (1974), *modified,* 286 N.C. 99, 209 S.E.2d 476 (1974); *In the Matter of Marine,* 82 Wis.2d 602, 264 N.W.2d 285 (1978). Moreover, we agree with these remarks from *Carmichael v. Iowa State Highway Commission,* 219 N.W.2d 658, 664–65 (Iowa 1974), where the court, in dealing with a claimed contingent-fee contract, noted the provisions of EC 2–19 and 2–23, and stated: "We cannot release this appeal without noting the lawyer-applicants are responsible for the ambiguous and obscure nature of their employment agreement.... [N]o lawyer retained on a contingent fee basis should be too busy to prepare a written instrument precisely detailing all terms of the employment contract."

We recognize that it is often not possible for a lawyer to inform the client in advance as to the exact amount of the fee that will be charged. However, we do believe that the obligation rests with the lawyer to inform the client clearly as to the manner or method upon which the fee charge will be based. We do not suggest, however, that because a lawyer and his client have a dispute over the amount of the fee charged that this automatically results in an ethical violation on the part of the lawyer.

■ There is no disciplinary rule in the Code of Professional Responsibility requir-

ing a written fee agreement.[2] In the Preliminary Statement of the Code, this remark is made: "The Disciplinary Rules, unlike the Ethical Considerations, are mandatory in character. The Disciplinary Rules of the Code of Professional Responsibility state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action."[3] Courts have generally adopted this standard. *E.g., Financial General Bankshares, Inc. v. Metzger,* 523 F.Supp. 744 (D.D.C.1981), *vacated for jurisdictional reasons,* 680 F.2d 768 (D.C.Cir.1982); *Matter of Mercer,* 133 Ariz. 391, 652 P.2d 130 (1982); *Kizer v. Davis,* 174 Ind.App. 559, 369 N.E.2d 439 (1977); *State v. Alvey,* 215 Kan. 460, 524 P.2d 747 (1974); *Matter of Olkon,* 324 N.W.2d 192 (Minn.1982); *Matter of Sedor,* 73 Wis.2d 629, 245 N.W.2d 895 (1976). At least one court has held that the violation of an Ethical Consideration may form the basis for disciplinary action. *Committee on Professional Ethics v. Behnke,* 276 N.W.2d 838 (Iowa 1979), *appeal dismissed,* 444 U.S. 805, 100 S.Ct. 27, 62 L.Ed.2d 19 (1979).

■ What makes the fee issue more serious is that Mr. Tatterson made no appropriate accounting with his clients as to how his fee was being calculated at the time the $17,500 settlement proceeds were disbursed on March 17, 1981. Disciplinary Rules 9–102(B)(3) and 9–102(B)(4) require that a lawyer maintain records on his clients' funds and properly account for and pay over to his clients those funds.[4]

The purpose of the accounting requirement in DR 9–102(B)(3) is to protect the client's funds and to minimize disputes between attorney and client. See commentary on DR 9–102(B)(3) in the American Bar Foundation's, *Annotated Code of Professional Responsibility* DR 9–102(B)(3), p. 406 (1979); *Louisiana State Bar Association v. Edwins,* 329 So.2d 437 (La.1976).

If Mr. Tatterson had made a proper accounting to the Wickhams at the time of the distribution of the settlement proceeds, we are of the view that the dispute or lack of understanding regarding the fee would have become readily apparent. A similar conclusion was reached by the court in *Louisiana State Bar Association v. Edwins,* 329 So.2d at 444:

"Edwins' carelessness in accounting to his client for the proceeds of the settlement should be reprimanded. Thomas did not, in fact, receive an accounting until the disciplinary hearing below. If an itemized statement had been furnished the client at the time of the settlement, his client's dissatisfaction and his unfounded suspicion that he had not received all amounts due him might have been avoided. An attorney's conduct should avoid even the appearance of impropriety."[5]

Mr. Tatterson could then have avoided ethical problems regarding the distribution of the funds to himself by placing them in his clients' trust account as required by DR 9–102(A)(2).[6]

---

**2.** Disciplinary Rule 2–106(A) provides: "A lawyer shall not enter into an agreement for charge, or collect an illegal or clearly excessive fee." In the present case, the Committee did not make a charge under this rule.

**3.** The Code of Professional Responsibility is divided into nine canons expressing, in general terms, the standards of professional conduct. Under each canon, there are a number of Disciplinary Rules and Ethical Considerations.

**4.** DR 9–102(B)(3) states that a lawyer shall "[m]aintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them."

DR 9–102(B)(4) provides that a lawyer shall "[p]romptly pay or deliver to the client as re-

quested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive."

**5.** It is true that by letter dated April 6, 1981, Mr. Tatterson did render an accounting to the Wickhams. *See* note 1, *supra.* However, by this time he had already obtained dominion over $9,424 of the funds that were in dispute and which he was treating as his fee rather than holding in his clients' account as required by DR 9–102(A)(2).

**6.** DR 9–102(A)(2) provides:

"Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due *unless the right*

A number of courts have held that where there is a dispute between the attorney and the client as to the fee, the attorney is not permitted under DR 9–102(A)(2) to withdraw funds that belong to the client in order to satisfy the fee. The court in *In the Matter of Marine, supra,* found a disciplinary violation for applying a client's funds to pay a disputed fee and stated:

"[A]greement must be reached between the attorney and the client on at least three points: (1) the right of the attorney to look to the client for the payment of these fees; (2) the amount to which the attorney is entitled; and (3) the time at which payment will be expected.

\* \* \* \* \* \*

"[C]onsidering the fiduciary nature of the relationship between attorney and client and the total failure of the attorney ... to clarify his anticipation of remuneration from the client, we conclude that Marine withdrew funds from the ... trust account in violation of DR 9–102(A)(2)." 82 Wis.2d at 610–11, 264 N.W.2d at 288–89.

*See also Greenbaum v. State Bar,* 15 Cal.3d 893, 544 P.2d 921, 126 Cal.Rptr. 785 (1976); *Akron Bar Association v. Hughes,* 46 Ohio St.2d 369, 348 N.E.2d 712 (1976); *Matter of Geralds,* 402 Mich. 387, 263 N.W.2d 241 (1978).

The accounting issue cannot be separated from the misrepresentation issue. Disciplinary Rule 1–102(A)(4) provides that a lawyer shall not "[e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation." The Committee found that Mr. Tatterson had misrepresented to the Wickhams that the amount he retained, viz. $9,424, was to be utilized to reimburse State Farm for its payment of the deed of trust. Mrs. Wickham testified that Mr. Tatterson made this statement to her when she questioned him on March 17 about the amount he was withholding.

Mr. Tatterson denied at the Committee hearing that he advised the Wickhams that he was retaining the money from the $17,500 settlement to repay State Farm. However, his letters of April 3, 1981, to Mr. Watson, the State Farm attorney, and to the Wickhams asserted the contrary. Moreover, his April 6, 1981 letter to the Wickhams, *see* note 1, *supra,* begins with the statement "I am pleased to tell you ... that State Farm is paying the mortgage without recourse."

There can be no question that Mr. Watson's letters of February 26 and March 16, 1981, to Mr. Tatterson clearly show that the $17,500 check represented a net settlement and that State Farm had paid off the bank loan on the Wickhams' property without expectation of reimbursement. Included in the letter of March 16 was documentary proof of this fact, i.e., the original deed of trust and note and the assignment to State Farm.

It is impossible in light of Mr. Tatterson's letters and the other documents to give credence to his explanation that he knew no reimbursement was necessary, but sent the letters and check to State Farm in panic after Mrs. Wickham called him on April 2, 1981. It was in this phone call that Mrs. Wickham informed Mr. Tatterson that the State Farm personnel had advised her no reimbursement was necessary.

We, therefore, conclude that Mr. Tatterson did not render a correct accounting to the Wickhams by misrepresenting to them the need to reimburse State Farm.[7]

---

*of the lawyer or law firm to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved."* (Emphasis added)

**7.** The Committee, as noted in the beginning of this opinion, found a number of charges arising out of this incident. However, we decline to discuss all of them since there is some redundancy. It found that Mr. Tatterson failed to deliver to his clients their proper share of the settlement proceeds and that he converted their funds to his own use. The second charge is merely the mirror image of the first, and both appear to be embraced in the accounting disciplinary rule. The commingling charge arises because Mr. Tatterson, after disbursing the funds to the Wickhams, placed the amount he kept as his fee in his general office account rather than in his clients' trust account. This situation can be distinguished from the more common situation where the lawyer has taken clients' funds to which he had no fee claim and

As evidence of further impropriety, the Committee points to testimony of Mrs. Wickham in which she indicated that Mr. Tatterson had endeavored to persuade her to drop her complaint and not to appear at the hearing. We believe that in the context of the entire case, this matter is not egregious. Mr. Tatterson did meet with the Wickhams shortly after the complaint was filed in an apparent effort to make a final resolution of the fee question.

The evidence does not appear to be in dispute that at the conclusion of the meeting the Wickhams agreed to accept a payment in the amount of $1,875 from Mr. Tatterson to satisfy the fee dispute. Mrs. Wickham indicated that she would send a letter to the State Bar signifying her satisfaction with the fee arrangement. Apparently this was done, although a copy was not entered into the hearing record.

We recognized in *Committee on Legal Ethics v. Pence*, W.Va., 216 S.E.2d 236, 241 (1975), that "the repayment of a client's funds will not prevent disciplinary proceedings against an attorney." *See also In Re Wholey's Case*, 110 N.H. 449, 270 A.2d 609 (1970); *In Re Benedict*, 254 S.C. 481, 175 S.E.2d 897 (1970); *Matter of Zderic*, 92 Wash.2d 777, 600 P.2d 1297 (1979). Some courts have considered the question of repayment as an issue of mitigation, particularly where the repayment is made before the institution of disciplinary proceedings. *E.g., Louisiana State Bar Ass'n v. Philips*, 363 So.2d 667 (La.1978); *In Re Wholey's Case, supra; Matter of Miller*, 68 A.D.2d 544, 418 N.Y.S.2d 69 (1979); *Matter of Kumbera*, 91 Wash.2d 401, 588 P.2d 1167 (1979); Annot., 94 A.L.R.3d 846, 867 (1979). Where the restitution has been made after the commencement of disciplinary proceedings, or when made as a matter of expediency under the pressure of the threat of disciplinary proceedings, some courts have refused to consider it a mitigating factor. *E.g., In Re Lyons*, 15 Cal.3d

322, 540 P.2d 11, 124 Cal.Rptr. 171 (1975); *Simmons v. State Bar of California*, 70 Cal.2d 361, 450 P.2d 291, 74 Cal.Rptr. 915 (1969); *In Re Staples*, 259 Or. 406, 486 P.2d 1281 (1971).

The Committee recommends that we suspend Mr. Tatterson's license to practice law for a period of two years. In reviewing our prior disciplinary cases involving related charges, we believe that a six-month suspension is a more appropriate penalty. In *Committee on Legal Ethics v. Pence*, W.Va., 216 S.E.2d 236 (1975), the client authorized the attorney to retain the client's share of a settlement check, i.e., $30,000, until the client returned from a vacation. Thereafter, the client repeatedly attempted to secure the funds over a period of almost a year, but was unsuccessful. He had to hire an attorney to help secure the funds which had been commingled in the attorney's general account. A one-year suspension was imposed. This situation was more egregious than the present case since there was no fee dispute and the lawyer, in effect, improperly withheld his client's funds.

In both *Committee on Legal Ethics v. Daniel*, 160 W.Va. 388, 235 S.E.2d 369 (1977), and *Committee on Legal Ethics v. Smith*, 156 W.Va. 471, 194 S.E.2d 665 (1973), the attorneys had taken retainers from clients and failed to perform the legal services and then refused to refund the clients' retainers. *Daniel* involved multiple derelictions and attorney Daniel was suspended for one year, while Smith, who had refunded part of the fee, was given a public reprimand.

Where there are shown to be a number of disciplinary infractions involving different clients' funds, we have considered this pattern of ethical violation to warrant an annulment of the attorney's license. *E.g., Committee on Legal Ethics v. Pence*, 161 W.Va. 240, 240 S.E.2d 668, 93 A.L.R.3d 1046 (1977); *In Re Hendricks*, 155 W.Va. 516, 185 S.E.2d 336 (1971).

---

commingled or used them for his office or personal expenses. *E.g., Committee on Legal Ethics v. Pence*, 161 W.Va. 240, 240 S.E.2d 668, 93 A.L.R.3d 1046 (1977); *In Re Moore*, 110 Ariz. 312, 518 P.2d 562 (1974); *In Re Pendergast*, 525 S.W.2d 341 (Mo.1975); *Columbus Bar Ass'n v.*

*Thompson*, 69 Ohio St.2d 667, 433 N.E.2d 602 (1982); *Matter of Galloway*, 278 S.C. 615, 300 S.E.2d 479 (1983). In these cases, there was no fee dispute and the lawyer appropriated funds belonging to his client for his personal use.

In view of the fact that there was only one episode involving one client and some voluntary refunding, we conclude that under the foregoing law, Mr. Tatterson's license to practice law should be suspended for a period of six months.

License Suspended for Six Months.