349 S.E.2d 919

**COMMITTEE ON LEGAL ETHICS OF the WEST VIRGINIA STATE BAR**

v.

**E. Dennis WHITE, Jr., A Member of the West Virginia State Bar.**

**No. 17065.**

Supreme Court of Appeals of West Virginia.

Decided Oct. 29, 1986.

**754**

West Virginia State Bar, Disciplinary Counsel, Charleston, for appellant.

Frederick D. Fahrenz, Preiser & Wilson, Charleston, for appellee.

**PER CURIAM:**

This action is a disciplinary proceeding instituted by the Committee on Legal Ethics of the West Virginia State Bar (hereinafter the Committee) against E. Dennis White, Jr., a member of the Bar. The Committee has recommended that this Court disbar Mr. White (hereinafter respondent) from the practice of law.

The Committee has charged the respondent with violating DR 1–102(A)(4) and (6) of the Code of Professional Responsibility which state, "A lawyer shall not: ... (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation ... (6) Engage in any other conduct that adversely reflects on his fitness to practice law." He has also been charged with violating DR 5–104(A) and DR 5–105(B) of the Code of Professional Responsibility,[1] which limit entering into business relationships with a client and accepting conflicting employment. The Committee has alleged that the respondent entered into business transactions with a client with differing interests and continued employment with a client when the competing interests of the other client would have impaired the independent professional judgment of the respondent.

By separate count, the Committee charged the respondent with violating DR 9–102 of the Code of Professional Responsibility by allegedly failing to preserve the identity of the funds and property of a client.[2] A third count in the "Statement of

---

1. These disciplinary rules provide:

DR 5–104(A): "A lawyer shall not enter into business transaction with a client if they have different interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure."

DR 5–105(B): "A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5–105(C)."

The exception contained in DR 5–105(C) provides:

"In the situations covered by DR 5–105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full dis-

closure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each."

2. DR 9–102 provides:

"Preserving Identity of Funds and Property of a Client.—(A) All funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:

"(1) Funds reasonably sufficient to pay bank charges may be deposited therein.

"(2) Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is

Charges" brought against the respondent was dismissed by the Committee when the complainant failed to prosecute the allegations contained therein.

A panel of the Committee conducted hearings upon the charges brought against the respondent. Thereafter, the Committee issued its findings of fact and conclusions of law and recommended to this Court that the respondent be disbarred from the practice of law. After the filing of briefs and the presentation of oral argument on behalf of both parties, the case was submitted to this Court for a decision.

■ We note initially that we have historically placed the burden on the Committee to prove its charges against an attorney by full, preponderating, and clear evidence, as we stated in Syllabus Point 1 of *Committee on Legal Ethics v. Lewis*, 156 W.Va. 809, 197 S.E.2d 312 (1973):

"In a court proceeding prosecuted by the Committee on Legal Ethics of the West Virginia State Bar for the purpose of having suspended the license of an attorney to practice law for a designated period of time, the burden is on the Committee to prove by full, preponderating and clear evidence the charges contained in the complaint filed on behalf of the Committee."

*See also* Syllabus Point 1, *Committee on Legal Ethics v. Tatterson*, 173 W.Va. 613, 319 S.E.2d 381 (1984); Syllabus Point 1, *Committee on Legal Ethics v. Pence*, —— W.Va. ——, 216 S.E.2d 236 (1975).

■ From a review of the record and exhibits, we find that the Committee has met this burden. There were some conflicts in the testimony, but as we said in Syllabus Point 3, in part, of *In Re Brown*, 166 W.Va. 226, 273 S.E.2d 567 (1980):

disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved.
"(B) A lawyer shall:
"(1) Promptly notify a client of the receipt of his funds, securities, or other properties.
"(2) Identify and label securities and properties of a client promptly upon receipt and place them in a safe deposit box or other place of safekeeping as soon as practicable.

"Absent a showing of some mistake of law or arbitrary assessment of the facts, recommendations made by the State Bar Legal Ethics Committee ... are to be given substantial consideration."

## I.

The evidence presented as to Count I against the respondent was that Earl and Lucille Scarberry had engaged the respondent to handle some legal matters. The respondent assisted them in the sale of real estate, from which they received certain funds. The respondent advised the Scarberrys that he was aware of an arrangement whereby if they loaned $5,000 they could receive interest at the rate of 20 percent with the repayment of principal at $1,000 per month.

The Scarberrys testified that they agreed to make the loan, but stated it was their understanding that the respondent would be responsible for the repayment of the money. They admitted that the respondent had indicated the money would go to a third person. The name of the third person was not disclosed to them at the time they gave the money to the respondent. Subsequently, it appears that the respondent entered into some arrangement with a Paul Enyart, who was president of Empire Financial Services. The respondent was the general counsel to this company and a friend of Mr. Enyart.

On July 28, 1981, the respondent wrote a letter to the Scarberrys which included a check in the amount of $1,000. This letter referred to the check as a "loan" to them. On August 28, 1981, the respondent sent to the Scarberrys a check in the amount of $500 which the respondent again referred to as an "additional loan" to them. On November 2, 1982, the Scarberrys wrote to the respondent notifying him that they

"(3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them.
"(4) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive."

were discharging him from further representation. They demanded that he return to them the money owed and provide to them a "complete accounting of the loan transaction and the funds now held in excrow (sic) by you."

At this point, the respondent had made $3,500 in payments. Shortly after this demand, the Scarberrys filed a formal complaint with the State Bar because of the respondent's failure to account. Subsequently, on January 18, 1982, Mr. Enyart delivered a cashier's check in the amount of $1,500 to the Scarberrys. No interest on the principal was ever paid to the Scarberrys by the respondent, or by any other person on his behalf.

We find that the evidence supports a violation of DR 1-102(A)(4) and (6). The respondent's defense that he was acting as a trustee or broker in dealing with the Scarberrys' money, which would be loaned to a third party, Mr. Enyart, is not credible. The Scarberrys did not know Mr. Enyart at the time they gave their money to the respondent. Their testimony was that they expected the respondent to be responsible for repayment and this is supported by the respondent's initial payments to the Scarberrys. The respondent's letters to the Scarberrys accompanying his checks, in which he characterized the money sent to them as a "loan to you," was a misrepresentation of the transaction.

It bears some relationship to the misrepresentation we found to exist in *Committee on Legal Ethics v. Tatterson*, 173 W.Va. 613, 319 S.E.2d 381 (1984). There the attorney withheld funds from the settlement of a fire loss. He represented to the client that the funds were needed to discharge a deed of trust on the property. However, the deed of trust had already been discharged by the fire insurance company. We found this to be a violation of the misrepresentation bar of DR 1-102(A)(4). Furthermore, some courts have held that where an attorney borrows money from his client without making a full disclosure of all the pertinent circumstances of the loan, he has committed a disciplinary offense. *E.g., Matter of Kali,*

124 Ariz. 592, 606 P.2d 808 (1980); *In Re Staples,* 259 Or. 406, 486 P.2d 1281 (1971). These cases proceed on the theory that a fiduciary relationship exists between an attorney and his client.

There is ordinarily an inequality in the relationship between an attorney and client. The client comes to the attorney trusting in his expertise and honesty. He often accepts the attorney's representations without making any independent evaluation. For this reason, there is a higher obligation on an attorney to deal with his client in financial matters in a forthright and honest manner. We find that the respondent also violated DR 5-104(A) in the procurement of the loan by not disclosing all of the relevant facts.

## II.

The second count against the respondent relates to his dealings with the Estate of Charles Arnold of which he was a cotrustee along with a Mr. Pearman. At the respondent's suggestion, a matured certificate of deposit in the amount of $160,000 drawing interest at 5.72 percent per annum was converted to a certified check payable to both trustees. This check was deposited in the respondent's fiduciary fund kept by his law office at the Guaranty National Bank in Huntington on August 3, 1978. Mr. Pearman testified that the respondent had advised him that the purpose of this transaction was to enable the respondent to invest the proceeds in certificates of deposit in a New York financial institution.

The record shows that this entire amount was disbursed out of the respondent's trust account in approximately two weeks. The respondent admits that the money was sent to certain banks and individuals at the direction of a Joseph LaMonica who informed the respondent that he was investing the money in Scotch Whiskey certificates. No certificates were ever obtained by the respondent nor was any document ever found as to the arrangement with Mr. LaMonica. The respondent's defense was that this was a loan to Mr. LaMonica. In his deposition testimony introduced at the Committee hearing, Mr. LaMonica also stated it was a

loan and that he had executed a note payable to the Arnold Estate. The respondent stated that he had lost the note.[3]

The Committee's argument is that the respondent misrepresented and concealed from his cotrustee and the beneficiaries of the trust the nature of the transaction in violation of DR 1–102(A)(4). Furthermore, it contends that the respondent commingled $45,000 of the trust funds with his own funds which would be a violation of DR 9–102 and further failed to account for the funds as required by this disciplinary rule.[4] Finally, the Committee claims that the respondent profited from the transaction by having his personal debt repaid.

With regard to the misrepresentation, the record demonstrates that the cotrustee Mr. Pearman made repeated inquiries to the respondent about the $160,000. He was not informed of the nature of the transaction except that it had been invested out of the United States. Mr. Pearman hired counsel in January, 1981, which eventually resulted in the respondent's repayment of the $160,000 together with some $70,000 in interest.

Despite the respondent's assertion that the evidence does not support the charge that he commingled $45,000 of the Arnold Estate funds with his own funds, we believe the evidence warrants such a conclusion. After the initial deposit of the $160,-000 in the respondent's trust fund account on August 3, 1978, he wrote from this trust account Check No. 1117 in the amount of $45,000 payable to Guaranty National Bank of Huntington on August 16, 1978. On this same date, he wrote a check from his personal account at The Security Bank in

Huntington in the amount of $30,000 payable to Guaranty National Bank. On this same day, the Guaranty National Bank cabled $75,000 to its correspondent bank in New York with directions that it transfer this same amount to the Canadian Imperial Bank of Commerce located in Nassau, Bahamas. The originating cable transfer of Guaranty National Bank which contained this information showed that it was authorized by "Order E. Dennis White, Jr."

As to the respondent's profiting from the transaction, the Committee submits that the record shows that in February, 1979, $85,000, which represented a part of the $160,000 obtained from the Arnold Estate, was sent by Mr. LaMonica to Mr. Enyart who was president of Empire Financial Services. According to Mr. Enyart, approximately $78,000 of this money was used to pay off a $75,000 personal loan that the respondent had at the Security Bank in Huntington. This testimony was documented by cancelled checks. Both Mr. LaMonica and Mr. Enyart stated that this money came from the sale of whiskey certificates.

Although the foregoing facts only encompass the general outline of what was an extremely complex transaction,[5] we believe it suffices to show serious professional misconduct. Courts have uniformly held that where an attorney has obtained funds from a client to hold for designated purposes, he assumes a fiduciary duty with regard to those funds. In Syllabus Point 5 of *Committee on Legal Ethics v. Pence*, 161 W.Va. 240, 240 S.E.2d 668, 93 A.L.R.3d 1046 (1977), we said:

---

**3.** Although not discussed by the parties, it is clear that as a trustee, the respondent was controlled as to making investments of trust funds by W.Va.Code, 44–6–2. This statute lists certain types of investments that may be made by fiduciaries without a prior court order. The loan to Mr. LaMonica and the investment in Scotch Whiskey certificates would not qualify under this provision. There was no court order involved nor was it argued that the investment terms of the trust instrument gave broad investment authority to the trustees. The Uniform Principal and Income Act, W.Va.Code, 36–6–1 et seq., does not appear to cover this situation.

**4.** As to the text of DR 9–102, *see* note 2, *supra.*

**5.** Committee documents show seven checks (other than the check on August 16 for $45,000) written by the respondent to the Guaranty National Bank from the initial deposit of the $160,-000 into the trust account on August 3, 1978. These checks total $84,800. In some instances, credit memos from the Guaranty National Bank were obtained dated the same date, which reflect this money was wired to out-of-state banks by order of E. Dennis White, Jr. However, the Bar was unable to develop the ultimate recipient of the funds.

"Detaining money collected in a professional or fiduciary capacity without bona fide claim coupled with acts of dishonesty, fraud, deceit or misrepresentation justify annulment of an attorney's license to practice law."

*See also In Re Moore,* 110 Ariz. 312, 518 P.2d 562 (1974); *In Re Pendergast,* 525 S.W.2d 341 (Mo.1975); *Columbus Bar Ass'n v. Thompson,* 69 Ohio St.2d 667, 433 N.E.2d 602 (1982); *Matter of Galloway,* 278 S.C. 615, 300 S.E.2d 479 (1983).

In this case, the respondent as a cotrustee was already under a fiduciary duty with regard to the management of the investments of the Arnold Estate Trust. *E.g., Committee on Professional Ethics v. Brodsky,* 318 N.W.2d 180 (Iowa 1982); *State v. Freeman,* 229 Kan. 639, 629 P.2d 716 (1981); *Kentucky Bar Ass'n v. Berry,* 626 S.W.2d 632 (Ky.1981); *In re Warnock,* 423 P.2d 929 (Wash.1967); *cf.* Annot., 92 A.L.R.3d 655 (1979). In each of the foregoing cases, the attorney was found to have improperly handled the trust corpus. In *Brodsky,* the attorney was an executor who had bought stock in his personal name utilizing funds in the estate. About a month later, he sold the stock making a $2,100 profit and repaid the estate for the amount originally taken.[6]

The attorney-trustee in *Freeman* took trust funds and used them to pay some of his personal debts. He was found guilty of violating DR 1–102(A)(4) and (6), as well as with failing to maintain records and render a proper account as required by DR 9–102(B)(3) and (4). The court ordered his disbarment.

The attorney in *Smith* was the custodian of a loan agreement covering $25,000 which he deposited in his trust account and then utilized the money to repay a personal debt of approximately $6,700. He spent the balance on personal expenditures. He was found guilty of violating DR 1–102(A)(4) relating to dishonesty, fraud, and misrepresentation, as well as DR 9–102 relating to accounting, and was disbarred.

In *Berry,* the attorney-executor made loans from estate funds to himself, his brother, daughter, and law partner. The loans were unsecured and his brother was unable to repay the loan. The court grounded the attorney's duty on ordinary trust law: "The respondent occupied a fiduciary capacity with the estate. He was a trustee and as such owed the *cestui que* trust the highest fidelity and honesty in managing the assets of the estate." 626 S.W.2d at 633. We have found the same standard to exist with regard to a fiduciary. *See* Syllabus Point 1, *Tabler v. Weller,* 176 W.Va. 267, 342 S.E.2d 234 (1986);[7] Syllabus Point 1, *Latimer v. Mechling,* 171 W.Va. 729, 301 S.E.2d 819 (1983); Syllabus Point 4, *In Re: Estate of Lapinsky v. Sparacino,* 148 W.Va. 38, 132 S.E.2d 765 (1963).

Finally, in *Warnock,* the attorney was trustee, treasurer, and controlling manager of certain benevolent associations and was found not to have properly paid out or kept reasonable records on the trust funds and was disciplined for this and other derelictions by way of disbarment.

In the present case, the respondent violated DR 1–102(A)(4) and (6) in his initial misrepresentation to his cotrustee Mr. Pearman concerning the reinvestment of the $160,000, which was the first step upon the path that ended in the dissipation of the funds. The respondent also improperly commingled $45,000 of the trust money with $30,000 of his own, which resulted in

---

**6.** The attorney in *Brodsky* was given a three-year suspension even though it initially appears that he intended to buy the stock for the estate, but his broker put the stock in his personal account. The stock initially dropped in value and it was for this reason that Brodsky decided to keep the stock rather than have the beneficiaries criticize him. The court concluded that he was guilty of misrepresentation under DR 1–102(A)(4) since he never advised the beneficiaries of what he was doing.

**7.** Syllabus Point 1, in part, of *Tabler* states:

" 'An executor or administrator of the estate of a deceased person is under a duty to take custody of the estate and to administer it in such a manner as to preserve and protect it for ultimate distribution. In the discharge of such duty, he is held to the highest degree of good faith. . . .' Syllabus Point 4, *In re: Estate of Lapinsky v. Sparacino,* 148 W.Va. 38, 132 S.E.2d 765 (1963)."

the $75,000 wire transfer of funds through the Chemical Bank of New York to the Canadian Imperial Bank in Nassau, Bahamas. This was a violation of DR 9–102(A), which requires preserving the identity of funds and property of a client. Finally, his repeated failure to disclose and account for what had occurred with the funds was a violation of DR 9–102(B) relating to keeping proper records and accounting for client funds.

The respondent's defense that he had loaned the $160,000 to Mr. LaMonica cannot stand in the face of the case law that sets his fiduciary duty with regard to the funds. It was imprudent to commit the trust fund into this type of investment.

Finally, we cannot condone the utilization of approximately $78,000 of funds returned by Mr. LaMonica to pay off respondent's personal bank notes. The respondent participated in this because he was the person who endorsed the $85,000 check from Mr. LaMonica in order to have it placed in the Empire Financial Services bank account. It was from this account that the respondent's business associate, Mr. Enyart, wrote the $78,000 check to pay off the respondent's personal loan at Security Bank.

The respondent points to the mitigating fact that he made restitution of the entire amount plus approximately $70,000 in interest. We discussed the question of reimbursement in *Tatterson* and began by recognizing that in *Committee on Legal Ethics v. Pence*, —— W.Va. ——, ——, 216 S.E.2d 236, 241 (1975), "the repayment of a client's fund will not prevent disciplinary proceedings against an attorney." We indicated in *Tatterson*, 173 W.Va. at 619, 319 S.E.2d at 387–88, that repayment might in certain instances be considered as a mitigating factor for purposes of determining the disciplinary punishment:

"Some courts have considered the question of repayment as an issue of mitiga-
tion, particularly where the repayment is made before the institution of disciplinary proceedings. *E.g., Louisiana State Bar Ass'n v. Philips*, 363 So.2d 667 (La. 1978); *In Re Wholey's Case*, [110 N.H. 449, 270 A.2d 609 (1970)]; *Matter of Miller*, 68 A.D.2d 544, 418 N.Y.S.2d 69 (1979); *Matter of Kumbera*, 91 Wash.2d 401, 588 P.2d 1167 (1979); Annot., 94 A.L.R.3d 846, 867 (1979). Where the restitution has been made after the commencement of disciplinary proceedings, or when made as a matter of expediency under the pressure of the threat of disciplinary proceedings, some courts have refused to consider it a mitigating factor. *E.g., In Re Lyons*, 15 Cal.3d 322, 540 P.2d 11, 124 Cal.Rptr. 171 (1975); *Simmons v. State Bar of California*, 70 Cal.2d 361, 450 P.2d 291, 74 Cal.Rptr. 915 (1969); *In Re Staples*, 259 Or. 406, 486 P.2d 1281 (1971)."

In *Tatterson*, the attorney retained from his clients' settlement check certain legal fees which the clients considered excessive. There was no written fee agreement. He voluntarily reduced his fee by sending some of the retained money to the clients in hopes of settling the controversy. We noted in *Tatterson* that because there was a conflict over the amount of the fee, this "situation can be distinguished from the more common situation where the lawyer has taken client's funds to which he had no fee claim and commingled or used them for his office or personal expenses." 173 W.Va. at 618–619 n. 7, 319 S.E.2d at 387 n. 7. (Citations omitted).

Any rule regarding mitigation of the disciplinary punishment because of restitution must be governed by the facts of the particular case. Otherwise, restitution would override our statutory rule that requires an attorney to repay to his client funds of the client that he has misappropriated or declined to turn over. W.Va.Code, 30–2–12 and –13.[8]

---

8. W.Va.Code, 30–2–12, provides:
    "If any attorney-at-law or agent shall, by his negligence or improper conduct, lose any debt or other money of his client, he shall be charged with the principal of what is so lost,
and interest thereon, in like manner as if he had received such principal, and it may be recovered from him by suit or motion."
W.Va.Code, 30–2–13, states:

In the present case, the respondent made no disclosure initially to his cotrustee of what he had done by way of investing the money. Even after the cotrustee made inquiries about the investment, the respondent did not disclose the circumstances in any detail. This condition persisted from August, 1978, until the cotrustee was forced in January, 1981, to hire an attorney to investigate the matter and it was not until January, 1982, that the respondent made repayment. Under the foregoing circumstances, we do not believe that the respondent's repayment can be considered a mitigating factor.

 We conclude that the respondent's handling of the trust funds involved serious and egregious violations of the Code of Professional Conduct. When this is coupled with the violations in connection with the Scarberrys' monies, we conclude that the Committee's recommendation of disbarment should be affirmed and his license to practice law is hereby annulled. The respondent is also ordered to reimburse the Committee for the actual and necessary expenses incurred by it in connection with this proceeding.

License to Practice Annulled.

"If any attorney receive money for his client as such attorney and fail to pay the same on demand, or within six months after receipt thereof, without good and sufficient reason for such failure, it may be recovered from him by suit or motion; and damages in lieu of interest, not exceeding fifteen percent per annum until paid, may be awarded against him, and he shall be deemed guilty of a misdemeanor and be fined not less than twenty nor more than five hundred dollars."