[No. C. D. 1028. *En Banc.* April 6, 1950.]

*In the Matter of the Discipline of* EDMUND STAFFORD, *an Attorney at Law.*[1]

*Nelson R. Anderson,* for board of governors.

*Emmett G. Lenihan* (of *Lenihan & Ivers*), and *Stewart N. Lombard,* for respondent.

[1]Reported in 216 P. (2d) 746.

BEALS, J.—By a complaint verified by the president of the Washington state bar association July 21, 1949, the association charged Edmund Stafford, a member of the bar of this court, with violation of his duties as an attorney and of the ethics of the profession.

The complaint stated that respondent Stafford was admitted to the bar of this state in 1927, and that, September 26, 1935, he was censured for negligent conduct in accounting for funds. The complaint then alleged that, January 6, 1949, by order of the superior court for King county, Luke Barber was appointed special administrator of the estate of James Stevens, deceased; that respondent acted as attorney for the special administrator; that soon thereafter, respondent learned that the Linde Air Products Company, Mr. Stevens' employer, carried a group life insurance policy; that Mr. Stevens participated in the benefits of that policy to the extent of four thousand dollars, and had named Mrs. Esther Landon as his beneficiary; that respondent, after some effort, located Mrs. Landon, who called on him April 25, 1949; that respondent then informed Mrs. Landon that he had discovered a small estate in which she had an interest, but did not tell her the name of the estate or the amount of her interest therein; that respondent further told Mrs. Landon that the state allowed fifty per cent of the amount due the beneficiary to the attorney making or aiding in the recovery thereof, and that, thereupon, at respondent's request, Mrs. Landon signed the following memorandum:

"I, Esther Landon, hereby employ Edmund Stafford to act for me as my attorney in discovering assets to which I may be entitled either by way of property or insurance, and in consideration of his services in locating me and said properties or assets I hereby agree to pay him fifty (50%) per cent of any sum recovered by him.

"I hereby authorize him to act as my attorney-in-fact in negotiating any settlement or in satisfying any claim which I may have.

"Dated: This 25th day of April, 1949."

The complaint further alleged that Mrs. Landon returned to respondent's office the following day; that respondent

exhibited to her a check for four thousand dollars, drawn by the Metropolitan Life Insurance Company, payable to Mrs. Esther Landon, and requested her to endorse the check, which she refused to do; that, immediately thereafter, respondent signed Esther Landon's name on the check, also endorsing the check himself, and deposited it in his personal bank account; that respondent solicited employment and the right to represent Mrs. Landon; that he misrepresented the situation to her and practiced deception upon her by concealment of essential facts; that his entire course of conduct lacked candor and fairness and brings the legal profession into reproach; and that, if he was entitled to a fee for services rendered, his charge of fifty per cent of the four thousand dollars was exorbitant and unconscionable.

Respondent filed his answer to the complaint, admitting that James Stevens died in Seattle in December, 1948; that Luke Barber was appointed as special administrator the following month, and that respondent represented the administrator as his attorney. He also admitted the execution of the document, above referred to, by Esther Landon, further admitting that Mrs. Landon called at his office April 26, 1949; that respondent showed her the check for four thousand dollars payable to her; that he requested her to endorse the check; that Mrs. Landon refused to do so, and that respondent then endorsed the name of Esther Landon on the check, writing his own endorsement thereunder, and deposited the check to the credit of his personal bank account.

Respondent denied making several of the statements to Mrs. Landon which the complaint alleged that he had made, and that he solicited employment as her attorney. He also denied that he had been guilty of any unprofessional conduct, and that a charge of fifty per cent was exorbitant or unconscionable.

Respondent affirmatively pleaded that one W. R. Clark, a friend and client of respondent, was district manager of Linde Air Products Company; that, after Mr. Stevens' death, Mr. Clark requested respondent to locate Mrs. Lan-

don so that payment of the proceeds of the life insurance policy, in which she was named as beneficiary, might be made to her, stating that the company had been unable to locate Mrs. Landon, also stating that Mrs. Landon would be willing to pay respondent a fee for finding her, and that the company was anxious to have the proceeds of the policy paid to the beneficiary as soon as possible. Mr. Clark died January 11, 1949.

Respondent then detailed his actions in locating Mrs. Landon, which consumed approximately forty-seven hours before he succeeded in finding her, alleging that he assumed that Mrs. Landon would be willing to compensate him for services rendered for her benefit; that he felt justified in not disclosing to her the name of the insurance company until she had signed an agreement that would assure compensation to respondent for services rendered; that Mrs. Landon willingly signed the agreement above referred to; that respondent's only purpose in endorsing the check and depositing the same was to protect himself in his claim for payment for services rendered, and that respondent, because of the agreement which Mrs. Landon signed, had the right to endorse the check and deposit the same.

The deposited check, certain letters, and other documents were attached to respondent's answer as exhibits.

The matter came on for hearing before a trial committee, witnesses were examined, and findings of fact made. The committee found that respondent consumed forty-seven hours of time in locating Mrs. Landon, his search extending to Seattle, Tacoma, Everett, and Wenatchee; that, when Mrs. Landon first contacted him by telephone, respondent advised her that, "if she were the right Esther Landon, she was entitled to a small interest in an estate," and requested her to come to his office, which she promptly did; that respondent had prepared, in advance, the agreement above quoted which Mrs. Landon signed, after respondent had satisfied himself that she was the Esther Landon named in the insurance policy as beneficiary; that, after signing the agreement, Mrs. Landon consulted another attorney and

then returned to respondent's office, where he showed her the check, requesting her to endorse it, which she refused to do, and that, thereafter, there was some correspondence between Mrs. Landon's attorney and respondent.

The committee further found that respondent had endorsed the check (which appears from the check in evidence) and deposited the same to his credit, as above stated; that the entire proceeds thereof remained in respondent's account until May 18, 1949, at which time respondent deposited two thousand dollars in his trustee account; that, June 2, 1949, after correspondence between the insurance company and the bank, the entire sum of four thousand dollars was withdrawn and placed in a cashier's account by the bank, and that, thereafter, Mrs. Landon having represented that her endorsement to the check had been forged, the insurance company paid to her the entire sum of four thousand dollars. The committee also found that, during the time the funds in question were in respondent's personal account, his cash balance exceeded four thousand dollars.

In its report to the bar association, the committee stated that, in its opinion, respondent Stafford had been guilty of unprofessional conduct, enumerating five specific instances. Taking into consideration all of the circumstances disclosed by the evidence before it, and the fact that respondent had previously been censured by the state bar association, the committee formally stated that, in its opinion, respondent should be suspended from the practice of law in the state of Washington for three months.

Respondent filed formal exceptions to the committee's report, both as to its findings of fact, its conclusions, and its recommendation.

The record was then presented to the board of governors of the Washington state bar association, which acted thereon at its meeting at Chehalis, December 3, 1949, when a resolution was unanimously passed by the board approving the report of the trial committee, with the exception of one conclusion to the effect that respondent had been guilty of unethical conduct in depositing the proceeds of the four-

thousand-dollar check in his personal bank account. The president of the association and its counsel signed the report of the board, and caused the same to be filed in the office of the clerk of this court.

In its report to this court, the board of governors stated the conclusions of the trial committee, which, with one exception, the board approved, as follows:

"(1)   Mr. Stafford is guilty of soliciting the employment of himself by Mrs. Esther Landon through securing her signature to the written agreement when such solicitation was not warranted by any prior personal acquaintanceship or relations.

"(2)   Mr. Stafford is guilty of a breach of his duties as a lawyer in failing to reveal to Mrs. Landon full information as to her rights under the insurance policy. He had been employed by the Linde Air Products Company, which was interested in seeing that the funds reached their proper source, to locate Mrs. Landon and when he did so and was satisfied that she was the right Esther Landon, he was duty bound to disclose to her full information; instead, he used the knowledge he had to insure himself a large fee.

"(3)   Mr. Stafford is guilty of unprofessional conduct in signing Esther Landon's name to the check, endorsing it himself and depositing it in his personal bank account.

"(4)   [Not approved by the board.] Mr. Stafford is guilty of unprofessional conduct and breach of ethics in placing the funds in his personal account and commingling them with his personal funds.

"(5)   A charge of $2000 was exorbitant and unconscionable. No legal problems were involved. Only a search for the proper party."

The board of governors adopted the recommendation of the trial committee and unanimously recommended that respondent Stafford be suspended from the practice of law in the courts of the state of Washington for a period of three months.

The entire record, including a transcript of the evidence taken before the committee, is before us.

Respondent Stafford has filed in this court a statement in opposition to the report and recommendation of the board of governors, incorporating therein, by reference, his "EXCEP-

TIONS AND STATEMENT IN OPPOSITION TO REPORT OF TRIAL COMMITTEE."

The matter was argued before this court, sitting *En Banc,* by respondent's counsel and by the attorney for the state bar association, but no formal briefs have been filed. The questions presented, however, are fully disclosed by the record.

Respondent Stafford testified that Mr. Clark, representing Mr. Stevens' employer, requested him to locate Mrs. Landon. Of course, Mr. Clark's statement that Mrs. Landon would be willing to pay respondent a fee was purely gratuitous. Respondent himself testified that he was acting on behalf of the employer. It would seem that the employer's obligation would have been fully accomplished had it reported to the insurance company that the location of the beneficiary, Mrs. Landon, was unknown; but, as far as the record shows, respondent was employed by Linde Air Products Company to attempt to find Mrs. Landon. Upon the evidence, it would seem that, if respondent Stafford had not been able to locate Mrs. Landon, the corporation would have been obligated to compensate him for the time expended in searching for her. It is admitted that respondent had never heard of Mrs. Landon prior to the mention of her name to him by Mr. Clark, and that the first time they met was on the occasion of her call at respondent's office.

Testifying before the trial committee, respondent Stafford described his telephone conversation with a Mrs. Lillian Bloom, and his first contact with Mrs. Landon, when she telephoned him. Respondent testified that, on that occasion, he told Mrs. Landon that, in an estate which he was probating, there was an insurance policy naming Esther Landon as beneficiary; that, if Mrs. Landon would call at his office, it could be ascertained whether she was the person named in the policy; that Mrs. Landon and her friend, Mrs. Bloom, called upon respondent the next day, and that respondent became convinced that Mrs. Landon was the beneficiary named in the policy. Respondent then testified:

"And then, during the course of that conversation, I brought up the fact that I had done this work of trying to locate her and that I felt that I was entitled to a fee for so doing. And then I brought up and explained to her that the Bar Association schedule permitted me to charge a fee up to 50% and that under the circumstances and the contingency involved, I thought I was entitled to charge it in this instance, with which she readily agreed and signed the contract."

In response to the question, "You had the agreement prepared, did you?" respondent testified:

"Yes, sir. It was prepared between the time she phoned and the time she got in my office. Q. Showing you Association's exhibit 1, I will ask you if that is the original agreement? A. That is; yes, sir. Q. Did you display that to Mrs. Landon? A. I did. Q. Did she read it? A. She did. Q. And did she sign it? A. She did. . . . Q. Had you talked over with her if she did not execute a written agreement with you that you might never be paid for your services? A. Definitely. . . . Q. After this agreement was signed, I will ask you whether or not you were then told,—you have testified that you told Mrs. Landon it was the James Stevens estate? A. That is right. Q. Did you tell Mrs. Landon she was the beneficiary under the policy? A. I did. Q. Did you disclose everything to her except the name of the insurance company? A. I did. There was no mention made of the insurance company. Q. Did you have any reason for not telling her, on that first day, the name of the insurance company? A. No reason. I would have told her if she asked me, after I was convinced of her identity. . . .

"Q. It wasn't until you found out that the check was still available that you phoned and told her to come down? A. That is right. Q. Did they come down the second day? A. Yes, they came down the second day. Q. What, if anything, did you say to Mrs. Landon with reference to the endorsement on the check? A. I said, 'We have the check and here it is.' I said it would be necessary for her to endorse it along with me to get it cashed. Q. Did you show Mrs. Landon the face of the check so that she saw the name 'Metropolitan Life Insurance Company,' and saw the amount of $4000 and saw the amount with her name as beneficiary? A. Yes, I did. I handed it across the desk to her, while she was sitting there. Q. Did you cover up the face of the check? A. No, I did not. Q. And just to show her the back?

A. I did not. Q. What did she say with reference to endorsing the check? A. She said she was nervous and sick. She said she was apparently coming down with the flu. She showed no evidence of it whatever. She said she was too nervous to sign it just at that time but she would come back and do it the next day or the day after. Q. Did she then leave? A. Yes, she did. Q. After she had left, from her attitude in stating that she wouldn't sign the check that day because she was ill but that she would come back later, what was your impression as to whether she was being candid in telling you the truth about that? A. She appeared to me to be most insincere. It looked like she would leave there and attempt to collect the check through some other means. Q. Did you think, whether or not she attempted to collect the check by some other means, you would ever be compensated for your services? A. I was convinced I would not be if she had a chance to. Q. That was on the 26th? A. That was on the 26th. Q. What did you do and on what day further with reference to the check? A. On the following day,—that was in the afternoon when she left. On the following day, I was busy and in the late afternoon I made up a deposit of that check and mailed it over to the Seattle First National Bank, Main Branch."

In response to questions concerning the endorsement of the check, respondent testified:

"Q. (By Mr. Lenihan) With reference to the endorsement on the back of the check, respondent's exhibit 2, is that first signature the signature of Esther Landon? A. No. It is the name Esther Landon but it is my signature. Q. Did you write that name? A. Yes, I did. Q. Did you write your own name immediately underneath it? A. I did. Q. Both in your own handwriting? A. That is correct. Q. Did you attempt in any way to disguise the signature? A. Not a bit. Q. Upon what authority did you, in good faith, rely in signing the name of Esther Landon in your own name and depositing the check? A. My appointment as attorney-in-fact in the original agreement. . . .

"Q. (By Mr. Anderson) Well, as I understand it, then, on the afternoon of the second day that Mrs. Landon was at your office, you made this deposit slip up and mailed it to your bank? A. No,—it was the day following her second visit; after she left the office, I was engaged in something else that took me most of the next day. In fact, it was 4:00 o'clock of the next afternoon that she had not come back to

the office and I felt I should get it on for collection and I sent it in for deposit. Q. When she left the next day, did you expect her back? A. Frankly, I felt rather insecure about her. Q. If she wouldn't endorse this check, didn't you think that then she was taking away any authority that you might have had in the beginning to cash the check? A. No, I did not. Q. There was nothing in the agreement that gave you authority to endorse her name on that check was there? A. Yes, I thought so, —to act as attorney-in-fact for any assets to which she was entitled. Q. Now, the authority she gave you was 'To negotiate a settlement in saving any claim which I may have.' Was endorsing a check negotiating a settlement or was it saving any claim she had against anybody? A. I thought it was, definitely."

In response to questions by a member of the trial committee, respondent testified:

"Q. Do I understand you correctly that at the time you prepared this contract you knew of the insurance policy for $4000? A. That is right. Q. But you did not know of any other properties belonging, —to which Mrs. Landon might have been entitled? A. That is right; only the small checks that were in the administration to which she was not entitled at all. Q. But you did not know of any other things to which she might be entitled? A. No, I did not. Q. Did you think there might be other properties to which she would be entitled? A. No, —not to which she would be entitled, no."

Esther Landon, called as a witness by the attorney for the bar association, testified at some length concerning her conversations with respondent Stafford at his office. Her testimony, and that of her friend, Mrs. Bloom, differed in some important respects from respondent's testimony. Mrs. Landon testified, in part, as follows:

"Q. Will you tell us just as near as it happened what Mr. Stafford said to you when you came into his office with Mrs. Bloom? A. After a preliminary conversation, Mr. Stafford said he had had a lot of trouble trying to locate me. He said there was a small legacy left for me but he would tell me nothing until I had signed a document; that he was allowed by the State to get 50 per cent for any moneys or properties he recovered. He gave me the impression that he was looking for me for a long, long time. And I had no idea where

the estate was coming from at all. I signed the document which was to the effect that I would give him 50 per cent of any of the estate he would recover for me. After I signed the document, he asked if I knew James Stevens. I said I did. He said he passed away quickly at the Linde Air Reduction Company, —died of a heart attack. He said there was a small legacy left for me. . . . Q. Did he say whether the estate was large or small? A. A small estate, —a small legacy. He mentioned 'legacy.' Q. Did he tell you the name of the estate? A. He did not."

The document signed by Mrs. Landon, which is quoted above, was then introduced in evidence. The witness testified that respondent Stafford told her to return the following morning "and he would have some more papers to sign"; that the witness consulted her attorney, who told her to return to Mr. Stafford's office the following morning, which she did, accompanied by Mrs. Lillian Bloom; that respondent "placed a Metropolitan Life Insurance Company check in front of me and told me to endorse it and that he would go downstairs and cash it"; that the check was for four thousand dollars; that the witness, following the advice of her attorney, did not sign the check, and that, thereafter, she received from the insurance company a draft for four thousand dollars, she having made an affidavit to the effect that her signature on the first draft issued was forged.

The witness was interrogated at considerable length on cross-examination, testifying that Mr. Stevens had been a good friend of hers and had told her that she was the beneficiary in a life insurance policy, and also that he would remember her in his will, but had not mentioned that he had ever executed a will. She testified that she read the agreement submitted to her, prior to signing it. She further stated that, in a conversation with her counsel, she told him that she was willing to pay respondent Stafford a reasonable sum for his services in conveying to her the information concerning the insurance policy, but that she was of the opinion that two thousand dollars, half of the amount of the policy, was excessive. She testified that she later received the four thou-

sand dollars from the insurance company and had never paid respondent Stafford anything.

Mrs. Lillian Bloom, called as a witness by the committee, corroborated Mrs. Landon's testimony as to statements made by respondent Stafford on the occasion of their visits to his office.

The trial committee, which heard the witnesses, made its findings and, evidently, at least as to some matters, believed the testimony of Mrs. Landon and Mrs. Bloom as to what respondent said to Mrs. Landon during her first call at his office.

The board of governors of the bar association met and considered the trial committee's report, and unanimously approved the report and recommendation of the trial committee, "excepting only Conclusion No. 4 which found respondent's conduct to be unethical in depositing the funds in his personal bank account."

We are of the opinion that, upon the record before us, the board of governors was correct in approving and adopting the recommendation of the trial committee. Under the circumstances, the term of suspension from practice imposed upon respondent Stafford is not unduly severe.

The recommendation of the board of governors is approved, and respondent Edmund Stafford is suspended from the practice of law in the state of Washington for a period of three months.

ALL CONCUR.