352 S.E.2d 107

### The COMMITTEE ON LEGAL ETHICS OF the WEST VIRGINIA STATE BAR

v.

### Ray Michael TATTERSON, a Suspended Member of the West Virginia State Bar.

#### No. 17335.

Supreme Court of Appeals of West Virginia.

Dec. 19, 1986.

Jack M. Marden & Sherri Goodman Dusic, W.Va. State Bar, Charleston, for appellant.

McHUGH, Justice:

This disciplinary proceeding is before this Court upon the verified complaint of the Committee on Legal Ethics of the West Virginia State Bar (the Committee), seeking the annulment of the license to practice law held by Ray Michael Tatterson (the respondent), a suspended member of the State Bar.[1]

Upon a thorough review of the record we conclude that the Committee has shouldered its burden of proving that the respondent entered into an agreement for, charged and collected a clearly excessive fee in the underlying matter, in violation of Disciplinary Rule 2–106(A). We also conclude that the respondent's conduct constituted misrepresentation within the meaning of Disciplinary Rule 1–102(A)(4). Finally, we concur with the Committee's recommendation that the appropriate discipline under the circumstances is annulment of the respondent's license to practice law.

I.

On December 6, 1983, David T. Herbert, age 36, committed suicide. At the time of his death he was living in Hartford City, Indiana, where he worked for Armco (now, Applied) Composites of St. Charles, Illinois. He had been employed by Armco since 1969. He was insured under a group term life insurance policy written for Armco's employees by The Equitable Life Assurance Society of the United States (Equitable). The effective date of the policy, providing basic and supplemental benefits, was January 1, 1978. His mother, Nellie Marie Herbert (the complainant) was named as the beneficiary. At the time of his death, life insurance benefits totalling $61,000 were payable.

In processing a claim under the policy, the employer (Armco) was required to submit the following to Equitable: (1) a completed proof-of-death claim form executed by the beneficiary; (2) a death certificate; and (3) a newspaper notice or obituary, if obtainable. In submitting these materials to the insurer (Equitable), the employer was required to sign the claim form, thereby warranting that the employee was insured on the date of his death in accordance with the terms of the group policy and warranting that, to the best of the employer's knowledge, the claimant signing the form was the beneficiary entitled to the insurance proceeds. Equitable, not Armco, had the exclusive authority as to approval or denial of the claim.

At the time of her son's death Mrs. Herbert, a widow who lived near Farmington, West Virginia, was about 73 years of age and was in very poor health. She was legally blind. Mrs. Herbert learned of her son's death about a week afterwards.

There were long-standing differences between Mrs. Herbert and one of her daughters, a Mrs. Sally Vilbig, who lived in Illinois and who was a coadministrator of David Herbert's estate. The other coadministrator was a lawyer (a Mr. Forcum) with a law firm in Hartford City, Indiana. Being distrustful of her daughter's intentions, Mrs. Herbert sought the advice of the respondent, Ray Michael Tatterson. Mrs. Herbert met with the respondent for the first time on January 3, 1984. No fees were discussed and the respondent stated that he did not intend to charge a fee for obtaining and helping Mrs. Herbert complete the necessary papers to obtain the life insurance proceeds.

Shortly after this first meeting with Mrs. Herbert, the respondent called a Ms. Janice Johnsen, a personnel coordinator with Armco at the St. Charles, Illinois office, to determine what papers needed to be completed and submitted. Together with a letter of transmittal dated January 12, 1984, the respondent sent to Ms. Johnsen the claim form and a death certificate which he had obtained. Other than partially completing the claim form and notarizing Mrs. Herbert's signature thereon, obtaining the

---

1. On July 12, 1984, this Court ordered a six-month suspension of the respondent's license to practice law. *Committee on Legal Ethics v. Tatterson,* 173 W.Va. 613, 319 S.E.2d 381 (1984). Although this suspension period has elapsed, the respondent has not applied for reinstatement as a member of the State Bar, and his license to practice law has not, therefore, been restored to him. *See State Bar By-Laws* art. VI, § 32 (1986), set forth in volume 1A of the *W.Va.Code.*

death certificate and calling and writing Ms. Johnsen to submit the necessary papers, the respondent, by his own testimony, did nothing to assist Mrs. Herbert between January 4, 1984 and January 17, 1984.

On January 17, 1984, Ms. Johnsen called the respondent and informed him that the claim form had not been fully completed. Basic biographical data about David Herbert had been omitted. According to the respondent, Ms. Johnsen also advised him at that time that there might be a problem with payment of the insurance proceeds because of the suicide. Also according to the respondent, Ms. Johnsen advised him that Sally Vilbig had been to Ms. Johnsen's office and that Mrs. Vilbig had hired a lawyer to "get the insurance money." Ms. Johnsen categorically denied any suggestion of a problem with the insurance money and denied that Sally Vilbig had ever been to her (Ms. Johnsen's) office. Ms. Johnsen testified that Mrs. Vilbig had called her once and questioned whether the life insurance proceeds should be paid to Mrs. Herbert, who, according to Mrs. Vilbig, was senile. Mrs. Johnsen responded that the insurance would be paid to the named beneficiary, unless there was a contrary court order. Ms. Johnson never heard again from Mrs. Vilbig.

By letter dated January 11, 1984, Mr. Forcum, coadministrator of David Herbert's estate, inquired of Armco as to the status of the life insurance, but the focus of the letter was to determine if the insurance was payable to the estate or to a specific beneficiary. By a letter dated January 18, 1984, Ms. Johnsen responded to Mr. Forcum's letter of January 11, 1984. She informed him that David's mother, Mrs. Herbert, was the named beneficiary, that the respondent was her (Mrs. Herbert's) attorney to whom any correspondence should be directed and that the claim had already been sent to Equitable. The respondent admitted that he received a copy of this letter from Ms. Johnsen to Mr. Forcum. There was never any oral or written communication between Mr. Forcum and the respondent. In addition, there was no communication between Mrs. Vilbig and the respondent until after the life insurance proceeds were paid to Mrs. Herbert and the respondent had collected his fee.

After receiving the telephone call on January 17, 1984 from Ms. Johnsen, the respondent, on January 18, 1984, went to Mrs. Herbert's home to obtain the additional information to complete the claim form. On that date the respondent called Ms. Johnsen and gave her the needed information, which she inserted on the claim form. On January 18, 1984, the respondent also told Mrs. Herbert that there might be a problem collecting the life insurance proceeds. He testified that he and Mrs. Herbert at that time made a verbal contract, whereby he would receive a one-third percentage of the life insurance proceeds if he collected them for her.[2]

The Pittsburgh office of Equitable received the completed claim form, death certificate and newspaper notice on January 23, 1984. On February 2, 1984, Ms. Johnsen, pursuant to the directions of Equitable, sent the respondent a form for Mrs. Herbert to execute certifying that Nellie M. Herbert, the claimant, was one and the same person as Marie Herbert, the beneficiary of record on the insurance cards. Equitable gave no indications at all that there were any problems in connection with the life insurance claim.

On February 6, 1984, the respondent went to Mrs. Herbert's home. He brought with him the "one-and-the-same" form

---

2. Shortly thereafter, the respondent, for no legitimate reason appearing on the record, drove to his brother's home in Chichester, Ohio and, after an overnight stay there, drove to Hartford City, Indiana to conduct an "investigation" into David Herbert's death. He spent about nine hours there (excluding travel time). The respondent stated that he did not keep any records of the expenses he incurred on this trip. He visited the newspaper company, the police department, the coroner, the courthouse, a neighborhood bar frequented by David Herbert, and the Hartford City plant of Armco. The "investigation" confirmed what everyone already knew: that David Herbert's death was the result of suicide. After this trip the respondent spent about four hours researching the incontestability statutes of the states of West Virginia, Indiana, Illinois and Pennsylvania.

which he had retyped, a will which he had drafted for Mrs. Herbert and a written contingent-fee contract. The contingent-fee contract provided for the respondent "to prosecute or settle all claims for insurance against Equitable Life Assurance Society or others who shall be liable on account of the" death of David T. Herbert. In consideration of these services, Mrs. Herbert agreed to pay the respondent a sum equaling "thirty-three (33%) percent of whatever may be recovered and forty-five (45%) percent of whatever may be recovered if a second trial or appeal becomes necessary." On February 6, 1984, Mrs. Herbert executed the three documents brought to her by the respondent on that date.

On February 8, 1984, the respondent hand delivered the "one-and-the-same" form to the Pittsburgh office of Equitable. The Equitable representative informed him at that time that the life insurance claim of Mrs. Herbert was going to be paid. Prior to February 8, 1984, the respondent had not contacted Equitable at all about the claim.

On February 10, 1984, Equitable mailed the check in payment of the life insurance proceeds to Ms. Johnsen at Armco in accordance with standard procedures. The check was in the amount of $61,661.81 (including interest) and was made payable to Nellie M. Herbert. Ms. Johnsen mailed the check to the respondent on February 13, 1984.

On or about February 20, 1984, the respondent took the check to Mrs. Herbert. He also handed her a handwritten accounting reflecting the deduction of his fee in the amount of $20,334.63. She endorsed the check.[3] He shortly thereafter collected his fee and deposited her net proceeds in a bank account for her.

Mrs. Herbert subsequently filed a complaint with the State Bar, claiming the respondent's fee was clearly excessive. The Committee on Legal Ethics of the West Virginia State Bar conducted a preliminary investigation and notified the respondent of charges against him. An evidentiary hearing was held before a subcommittee.[4] The subcommittee subsequently filed its report, making findings of fact and conclusions of law. The full Committee thereafter adopted the subcommittee's report. The Committee afterwards filed its verified complaint with this Court, seeking disbarment of the respondent for his violation of Disciplinary Rule 2–106(A), Disciplinary Rule 1–102(A)(4) and Disciplinary Rule 1–102(A)(6) of this State's *Code of Professional Responsibility* (1983),[5] in light of the fact that the violation of these disciplinary rules occurred while another proceeding against the respondent (for misrepresentation to clients and for failure to make an accounting of client funds) was pending before this Court. *Committee on Legal Ethics v. Tatterson*, 173 W.Va. 613, 319 S.E.2d 381 (1984). In that case, which was

---

3. The report of the subcommittee conducting the evidentiary hearing in this matter indicated that the endorsement on the life insurance check was "less than a mirror image" of Mrs. Herbert's signature on the life insurance claim form or on the contingent-fee contract.

4. One of the members of the subcommittee was a layman who had served on the subcommittee in the prior disciplinary proceeding against the respondent resulting in a six-month suspension. The respondent objected to this layman's service again as a member of a subcommittee investigating legal ethics charges against the respondent. The respondent was permitted to examine this layman to determine whether he would base his decision in this case solely on the evidence in this case. The layman testified in the affirmative unequivocally. While we do not decide the general propriety of a person's service as a member of a body investigating legal

ethics charges against the same attorney in more than one case, the Court is satisfied that the respondent here has failed to show prejudice in his case as a result of the composition of the subcommittee. We note that the three-member subcommittee's report was unanimous and that such report and the record was subject to independent review by the full Committee and by us.

5. These disciplinary rules provide as follows. DR 2–106(A) states: "A lawyer shall not enter into an agreement for[,] charge or collect an illegal or clearly excessive fee." DR 1–102(A), prohibiting certain types of misconduct, states: "A lawyer shall not: ... (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.... [or] (6) Engage in any other conduct that adversely reflects on his [or her] fitness to practice law."

the first disciplinary proceeding against the respondent, we ordered a six-month suspension of the respondent's license to practice law.

## II.

### A.

At the outset this Court holds that the Committee has met its burden of proving the charges against the respondent by the full, preponderating and clear evidence. We have consistently required this type of proof in disciplinary proceedings against attorneys:

> "In a court proceeding initiated by the Committee on Legal Ethics of the West Virginia State Bar to annul [or suspend] the license of an attorney to practice law, the burden is on the Committee to prove, by full, preponderating and clear evidence, the charges contained in the Committee's complaint." Syllabus Point 1, *Committee on Legal Ethics v. Pence,* W.Va., 216 S.E.2d 236 (1975).

Syl. pt. 1, *Committee on Legal Ethics v. Tatterson,* 173 W.Va. 613, 319 S.E.2d 381 (1984). *See also* syl. pt. 1, *Committee on Legal Ethics v. White,* 176 W.Va. 753, 349 S.E.2d 919 (1986); syl., *Committee on Legal Ethics v. Dolly,* 176 W.Va. 250, 342 S.E.2d 217 (1986); syl. pt. 1, *Committee on Legal Ethics v. Higinbotham,* 176 W.Va. 186, 342 S.E.2d 152 (1986).

In this case the contingent-fee contract itself, prepared by the respondent, indicates that the contingent fee was in consideration of "recovering" the life insurance proceeds, not in consideration of preparing a will for Mrs. Herbert or "investigating" the suicide for a possible tort claim against the employer (Armco) for "causing" David Herbert's death. These "services" were contrived attempts to exaggerate the true nature of the respondent's minimal services in order to justify the contingent fee where there was no contingency. The full, preponderant and clear evidence shows that there never was any legitimate doubt about the receipt of the life insurance proceeds. The potential problem due to the fact that the insured committed suicide was without substance; two year incontestability clauses in group life insurance policies are standard, as the respondent discovered *before* preparing the written contingent-fee contract. The potential problem due to a possible claim or interference by Mrs. Herbert's daughter, Mrs. Vilbig, was ethereal at all times, not just from hindsight. The misrepresentations by the respondent to his client, Mrs. Herbert, concerning the difficulty in obtaining the life insurance proceeds and the obvious overreaching in this case are egregious and unconscionable.

### B.

It is clear that the respondent violated Disciplinary Rule 2–106(A) by "enter[ing] into an agreement for[,] charg[ing] [and] collect[ing] ... [a] clearly excessive fee." Disciplinary Rule 2–106(B) provides: "A fee is clearly excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee." The remainder of Disciplinary Rule 2–106(B) gives a noninclusive list of eight factors to be considered as guides in determining the reasonableness of an attorney's fee.[6] Ethical Consideration 2–17 also speaks to this subject:

**6.** The eight noninclusive factors for determining the reasonableness of an attorney's fee in a particular case, which are set forth in DR 2–106(B), are as follows:

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

(3) The fee customarily charged in the locality for similar legal services.

(4) The amount involved and the results obtained.

(5) The time limitations imposed by the client or by the circumstances.

(6) The nature and length of the professional relationship with the client.

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

(8) Whether the fee is fixed or contingent.

Applying each of these factors in this case, we see first that obtaining and assisting in the processing of the paperwork necessary to obtain

The determination of a proper fee requires consideration of the interests of both client and lawyer. A lawyer should not charge more than a reasonable fee, for excessive cost of legal service would deter laymen from utilizing the legal system in protection of their rights. Furthermore, an excessive charge abuses the professional relationship between lawyer and client.

Another Ethical Consideration, EC 2–23, stresses the importance of avoiding controversies over attorney's fees: "A lawyer should be zealous in his [or her] efforts to avoid controversies over fees with clients and should attempt to resolve amicably any differences on the subject." [7]

■ To avoid controversy a clear agreement, involving the *fully informed* consent of the client, should be reached as to the attorney's fee as soon as feasible:

As soon as feasible after a lawyer has been employed, it is desirable that he [or she] reach a clear agreement with his [or her] client as to the basis of the fee charges to be made. Such a course will not only prevent later misunderstanding but will also work for good relations between the lawyer and the client. It is usually beneficial to *reduce to writing* the understanding of the parties regarding the fee, *particularly when it is contingent*. A lawyer should be mindful that many persons who desire to employ him [or her] may have had little or no experience with fee charges of lawyers, and for this reason he [or she] should *explain fully* to such persons the reasons for the particular fee arrangement he [or she] proposes.

EC 2–19 (emphasis added). If an attorney's fee is grossly disproportionate to the services rendered and is charged to a client who lacks full information about all of the relevant circumstances, the fee is "clearly excessive" within the meaning of Disciplinary Rule 2–106(A), even though the client has consented to such fee. The burden of proof is upon the attorney to show the reasonableness and fairness of the contract for the attorney's fee. *See In re Kennedy,* 472 A.2d 1317, 1322, 1330–31 (Del.), *cert. denied,* 467 U.S. 1205, 104 S.Ct. 2388, 81 L.Ed.2d 346 (1984); *Florida Bar v. Moriber,* 314 So.2d 145, 149 (Fla.1975); *Harmon v. Pugh,* 38 N.C.App. 438, 444, 248 S.E.2d 421, 424–25 (1978), *petition for discretionary review denied,* 296 N.C. 584, 254 S.E.2d 33 (1979); *In re Stafford,* 36 Wash.2d 108, 113, 119, 216 P.2d 746, 748, 752 (1950) (en banc); C. Wolfram, *Modern Legal Ethics* § 9.3.1 at 520 (1986).

■ The requirement that the client be fully informed applies especially to a contingent-fee contract.[8] The client needs to

the life insurance proceeds and researching the incontestability statutes required only a very few hours and very limited skills. Second, services for obtaining the life insurance proceeds did not appear likely to preclude other employment by the respondent. In fact, he admitted that his practice at that time was limited due to the fact that the first disciplinary proceeding was pending against him at that time. Third, the respondent testified that he initially did not intend to charge for his services because they were "nothing." Fourth, about $60,000 was involved and that amount was obtained. It is important that this case involved life insurance, not liability insurance, for there was no possibility of having to negotiate and to apply the pressure of litigation in order to get what was due without dispute and which, under all indications, was going to be paid timely. Fifth, in conjunction with the second factor, there were no pressing time limitations in the uncontested underlying matter.

Sixth, the underlying matter was the first professional relationship between the respondent and Mrs. Herbert and, other than the preparation of a will for her at the same time, was the extent of the relationship. Seventh, there is nothing in the record to indicate that the experience, reputation or ability of the respondent was ever considered to be a factor in obtaining the life insurance proceeds. Eighth, the fee here was contingent, not fixed. This factor will be discussed *infra* in the body of this opinion.

7. "We do not suggest, however, that because a lawyer and his client have a dispute over the amount of the fee charged that this automatically results in an ethical violation on the part of the lawyer." *Committee on Legal Ethics v. Tatterson,* 173 W.Va. 613, 616, 319 S.E.2d 381, 385 (1984).

8. EC 2–20, in discussing contingent-fee contracts, notes the requirement of fully informing the client of all relevant factors (emphasis added below):

Contingent fee arrangements in civil cases have long been commonly accepted in the United States in proceedings to enforce

be fully informed as to the degree of risk justifying a contingent fee. Courts generally have insisted that a contingent fee be truly contingent. The typically elevated contingent fee reflecting the risk to the attorney of receiving no fee will usually be permitted only if the representation indeed involves a significant degree of risk. The clearest case where there would be an absence of real risk would be a case in which an attorney attempts to collect from a client a supposedly contingent fee for obtaining insurance proceeds for a client when there is no indication that the insurer will resist the claim. In the absence of any real risk, an attorney's purportedly contingent fee which is grossly disproportionate to the amount of work required is a "clearly excessive fee" within the meaning of Disciplinary Rule 2–106(A). *See Florida Bar v. Moriber,* 314 So.2d 145, 146–49 (Fla. 1975) (33⅓% of moneys due to client upon mother's death; layman could have performed same services as attorney; major funds passed to client by operation of law); *In re Teichner,* 104 Ill.2d 150, 153–54, 160–63, 83 Ill.Dec. 552, 553–54, 557–58, 470 N.E.2d 972, 973–74, 977–78 (1984) (25% of group life insurance; insurer paid proceeds routinely without question; attorney's claimed services were "artificial" and "exaggerated"), *cert. denied,* 470 U.S. 1053, 105 S.Ct. 1757, 84 L.Ed.2d 820 (1985); *In re*

*St. John,* 43 A.D.2d 218, 219–22, 350 N.Y.S.2d 737, 738–40 (1974) (33⅓% of accidental death benefits; attorney spent 20 hours completing application and conferring with insurer; not a "collection matter"); *In re Stafford,* 36 Wash.2d 108, 113, 119, 216 P.2d 746, 748, 752 (1950) (en banc) (50% of life insurance; attorney spent 47 hours to locate beneficiary; attorney had beneficiary execute a contingent-fee contract for attorney to collect for client "an interest in a small estate").[9]

Contracts for contingent fees, generally having a greater potential for overreaching of clients than a fixed-fee contract, are closely scrutinized by the courts where there is a question as to their reasonableness. This close scrutiny arises from the duty of the courts to guard against the collection of a clearly excessive fee, thereby fulfilling the primary purpose of attorney-disciplinary proceedings, specifically, protecting the public and maintaining the integrity of the legal profession. *See In re Teichner,* 104 Ill.2d 150, 160, 83 Ill.Dec. 552, 557, 470 N.E.2d 972, 977 (1984), *cert. denied,* 470 U.S. 1053, 105 S.Ct. 1757, 84 L.Ed.2d 820 (1985); F. MacKinnon, *Contingent Fees for Legal Services* 44–45 (1964).

### C.

In order to obtain the "clearly excessive fee," the respondent in this case misrepre-

---

claims. The historical bases of their acceptance are that (1) they often, and in a variety of circumstances, provide the only practical means by which one having a claim against another can economically afford, finance, and obtain the services of a competent lawyer to prosecute his claim, and (2) a successful prosecution of the claim produces a *res* [italicized in original] out of which the fee can be paid. Although a lawyer generally should decline to accept employment on a contingent fee basis by one who is able to pay a reasonable fixed fee, it is not necessarily improper for a lawyer *where justified by the particular circumstances of a case,* to enter into a contingent fee contract in a civil case with any client who, after being *fully informed of all relevant factors,* desires that arrangement.

9. *See also In re Kennedy,* 472 A.2d 1317, 1322–23, 1330–31 (Del.) (50% of temporary total disability workers' compensation to which there was clear entitlement), *cert. denied,* 467 U.S. 1205, 104 S.Ct. 2388, 81 L.Ed.2d 346 (1984); *Horton v. Butler,* 387 So.2d 1315, 1317 (La.Ct. App.) (25% of fire insurance proceeds; uncon-

tested loss; attorney merely contacted insurer and accepted proceeds check), *cert. denied,* 394 So.2d 607 (La.1980); *Hausen v. Davis,* 112 Misc.2d 992, 993, 448 N.Y.S.2d 87, 89 (Civ.Ct. 1981) (40–50% of undisputed no-fault insurance; attorney entitled to no fee); *In re Hausen,* 108 A.D.2d 206, 206–08, 488 N.Y.S.2d 742, 742–43 (1985) (same matter as in *Hausen v. Davis;* clearly excessive fee under DR 2–106(A)); *Harmon v. Pugh,* 38 N.C.App. 438, 442–43, 445, 248 S.E.2d 421, 423–25 (1978) (20% of life insurance; attorney through correspondence obtained medical information and autopsy report; attorney entitled to compensation on *quantum meruit* basis for "menial tasks" in uncontested claim), *petition for discretionary review denied,* 296 N.C. 584, 254 S.E.2d 33 (1979); C. Wolfram, *Modern Legal Ethics* § 9.4.2 at 532–33 (1986). *See generally* American Bar Foundation, *Annotated Code of Professional Responsibility* 100–02 (1979); annotation, *Attorney's Charging Excessive Fee as Ground for Disciplinary Action,* 11 A.L.R. 4th 133 (1982).

sented the difficulty in obtaining the life insurance proceeds. In so doing the respondent violated Disciplinary Rule 1–102(A)(4). "Disciplinary Rule 1–102(A)(4) provides that a lawyer shall not '[e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation.'" Syl. pt. 5, *Committee on Legal Ethics v. Tatterson*, 173 W.Va. 613, 319 S.E.2d 381 (1984).

### III.

■ Having concluded that the respondent has violated Disciplinary Rule 2–106(A) and Disciplinary Rule 1–102(A)(4), this Court must decide the appropriate disciplinary sanction. While we accord respect to the disciplinary recommendations of the Committee on Legal Ethics, such recommendations are only advisory. "'This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law.' Syllabus Point 3, *Committee on Legal Ethics v. Blair*, [174 W.Va. 494] 327 S.E.2d 671 (1984) [, *cert. denied*, 470 U.S. 1028, 105 S.Ct. 1395, 84 L.Ed.2d 783 (1985) ]." Syl. pt. 2, *Committee on Legal Ethics v. Lilly*, 174 W.Va. 680, 328 S.E.2d 695 (1985). In addition, each disciplinary proceeding is essentially *sui generis*.

> "In disciplinary proceedings, this Court, rather than endeavoring to establish a uniform standard of disciplinary action, will consider the facts and circumstances, including mitigating facts and circumstances, in determining what disciplinary action, if any, is appropriate, ..." Syl. pt. 2 [in part], *Committee on Legal Ethics v. Mullins*, 159 W.Va. 647, 226 S.E.2d 427 (1976).

Syl. pt. 2 (in part), *Committee on Legal Ethics v. Higinbotham*, 176 W.Va. 186, 342 S.E.2d 152 (1986).

■ Prior discipline of an attorney is a very significant factor in determining an appropriate disciplinary sanction against the same attorney in a pending disciplinary proceeding. *See Committee on Legal Ethics v. Tatterson*, 173 W.Va. 613, 619, 319 S.E.2d 381, 388 (1984); *Committee on Legal Ethics v. Pence*, 161 W.Va. 240, 252–53, 240 S.E.2d 668, 674–75 (1977); *Committee on Legal Ethics v. Daniel*, 160 W.Va. 388, 395, 235 S.E.2d 369, 372 (1977); *In re Kennedy*, 472 A.2d 1317, 1333–35 (Del.) (prior public censure; two-year suspension here), *cert. denied*, 467 U.S. 1205, 104 S.Ct. 2388, 81 L.Ed.2d 346 (1984); *In re Teichner*, 104 Ill.2d 150, 166–67, 83 Ill.Dec. 552, 560, 470 N.E.2d 972, 980 (1984) (prior two-year suspension; annulment here), *cert. denied*, 470 U.S. 1053, 105 S.Ct. 1757, 84 L.Ed.2d 820 (1985).

Prior discipline is an aggravating factor in a pending disciplinary proceeding because it calls into question the fitness of the attorney to continue to practice a profession imbued with a public trust. Indeed, "the primary purpose of the ethics committee is not punishment but rather the protection of the public and the reassurance of the public as to the reliability and integrity of attorneys[.]" *Committee on Legal Ethics v. Mullins*, 159 W.Va. 647, 651, 226 S.E.2d 427, 429 (1976). *See also Committee on Legal Ethics v. Pence*, 161 W.Va. 240, 253, 240 S.E.2d 668, 675 (1977). This Court also recognized this proposition in syllabus point 2 of *In re Daniel*, 153 W.Va. 839, 173 S.E.2d 153 (1970): "Disbarment of an attorney to practice law is not used solely to punish the attorney but is for the protection of the public and the profession."

Disbarment is, of course, the harshest disciplinary sanction, and before we impose such sanction we must exercise extreme care in examining all of the circumstances. The Committee on Legal Ethics has the same responsibility in making its recommendations:

> The ethics committee has customarily exercised its functions with great care and circumspection, and with keen awareness that when it recommends either suspension or disbarment it is suggesting that an individual be deprived of his [or her] method of earning a livelihood in a profession for which he [or she] has been extensively trained and to which in many instances he [or she] has devoted many years of his [or her] life.

*Committee on Legal Ethics v. Mullins,* 159 W.Va. 647, 651, 226 S.E.2d 427, 429 (1976). In the case now before this Court, what was said in *In re St. John,* 43 A.D.2d 218, 350 N.Y.S.2d 737 (1974), is pertinent:

> In our opinion, the unreasonableness of the respondent's fee and the circumstances under which it was imposed and obtained are indicative of a lack of consideration of the client's interests and an abuse of the respondent's professional relationship with her, all of which are hardly conducive to preserving the integrity of the legal profession and maintaining mutual respect and confidence between the members of the Bar and the society they serve.

43 A.D.2d at 222, 350 N.Y.S.2d at 740–41.

The respondent's violation of Disciplinary Rule 2–106(A) and Disciplinary Rule 1–102(A)(4) occurred while there was pending before this Court a disciplinary proceeding against the respondent involving a very similar "lack of consideration of the client's interests," and no mitigating factors have been shown on the record. We therefore conclude that "[f]ulfillment of those objectives [protecting the public and maintaining the integrity of the legal profession] requires that one [such as the respondent] who has manifested the degree of insensitivity to ethical standards demonstrated here and in the case disposed of earlier be disbarred." *In re Teichner,* 104 Ill.2d 150, 168, 83 Ill.Dec. 552, 561, 470 N.E.2d 972, 981 (1984), *cert. denied,* 470 U.S. 1053, 105 S.Ct. 1757, 84 L.Ed.2d 820 (1985).

Accordingly, the respondent's license to practice law is hereby annulled. The respondent is also ordered to reimburse the Committee for the actual and necessary expenses incurred by it in connection with this proceeding. *See State Bar By-Laws* art. VI, § 20 (1986); *Committee on Legal Ethics v. White,* 176 W.Va. 753, 760, 349 S.E.2d 919, 926 (1986).

License to Practice Annulled.